Argued March 2, affirmed and modified March 17, rehearing denied June 2, 1914.

## COOK v. DABNEY.*

## CITY LAND CO. v. DABNEY.

(139 Pac. 721.)

**Navigable Waters—Title—Power of State.**

1. Though on the admission of the state into the Union it was vested with title to lands under navigable waters, such title is subject, at all times, to the rights of navigation and fishery, and the state has no right to sell the beds of navigable streams in a way to interfere with their navigability.

[As to grants by the states of the lands under navigable waters so as to interfere with commerce, see note in 36 Am. St. Rep. 336.]

**Navigable Waters—Lands Under Water—Validity of Conveyance.**

2. Where land in the Willamette River, occasionally exposed in low water but usually under water, is sold by the state as tide land, the owner of the adjoining upland is entitled to have the conveyance set aside if it interferes with his riparian rights.

[As to the test of the navigability of a stream or other body of water, see note in Ann. Cas. 1914B, 1067.]

**Costs—Persons Liable—Effect of Disclaimer.**

3. In a suit to set aside a conveyance of land in a navigable river, where the original grantee of the land disclaims title, costs or disbursements should not be taxed against him.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

In Banc.    Statement by MR. JUSTICE BURNETT.

One of these suits is brought by James W. Cook against P. P. Dabney, Ethel Crane Dabney and A. A.

---

*The question of the right of a state to grant tide lands, is treated in a note in 22 L. R. A. (N. S.) 337.          REPORTER.

70 Or.—34

Lindsley, and the other by the City Land Company against the same defendants.

Because they involve identical questions, they were heard together on the same testimony by consent of the parties and of the court. The Willamette River, a navigable stream, is divided into two channels, north of and below the City of Portland, by Swan Island. The west branch passing this point is about 2,000 feet wide. The lands of the plaintiffs abut upon the west bank. Some years prior to the commencement of this suit there was erected a dike extending southerly from the upper end of Swan Island to the west bank of the river, designed to turn most of the water down the east channel. Apparently as the result of this structure, shoals began to form to the westward of Swan Island. In time at low water a sedimentary deposit began to appear, and the defendant Dabney had it surveyed. and, representing to the state land board that it was tide land, purchased it in two tracts for $24. The plaintiffs complain that the occupation of this alluvial deposit by private parties will interfere with the right of plaintiffs, as riparian proprietors, to have access to the navigable water of the stream washing their premises, and so have brought this suit to declare void the deeds from the state and the right of those claiming under them.

The complaint was traversed in material particulars, and the defendants, by affirmative allegation, trace their title through the deeds by the state land board, based upon petitions for the purchase thereof, describing the land as tide land.

The new matter of the answer was denied by the reply. From a decree in favor of the plaintiffs, the defendants have appealed.

AFFIRMED AND MODIFIED.

For appellants there was a brief over the name of *Messrs. Fulton & Bowerman,* with an oral argument by *Mr. Charles W. Fulton.*

For respondents there was a brief over the names of *Mr. A. E. Clark, Mr. J. H. Middleton* and *Mr. Malcolm H. Clark,* with an oral argument by *Mr. A. E. Clark.*

MR. JUSTICE BURNETT delivered the opinion of the court.

The testimony shows that the premises described in the deeds under which the defendants claim are for the greater part within the harbor lines established by the general government for purposes of navigation. It is also true, as a matter of fact, by the undoubted weight of the testimony that during most of the year the disputed tract is wholly submerged, and that water craft navigating the channel in the towage of logs and lumber, and for other purposes, daily pass over the place in question. It appears likewise that the form of this so-called island is continually changing by the action of the water, especially since a large section of the dike already mentioned has been removed. When not actually submerged, the tract, even at its highest point, is a great deal of the time barely awash.

1. For the reason that the place is not alternately covered and exposed every 24 hours by the action of the tide, it is manifestly not tide land; but this is not necessarily decisive of the question. If, in fact, the state had the right to sell the property so as to place it entirely in private ownership, it matters not to the plaintiffs under what name it was alienated if they themselves had no interest or estate in the demised premises. If the plaintiffs had no right there they would have no standing to question the authority of

the state, if such power existed, to sell the property. If, however, the state had no right to place the land in private ownership, and the exclusive exercise of such ownership would prejudice the rights of the plaintiffs growing out of their holdings on the river bank, equity in good reason would relieve them from this infringement of their property rights. It is true that upon the admission of the state into the Union it was vested with the title to the lands under navigable waters, subject, however, at all times to the rights of navigation and fishery. To all intents and purposes the title of the state was burdened with a trust, so to speak, in favor of those two occupations. It would have no right or authority so to dispose of the subjacent lands in a manner calculated to prejudice or impede the exercise of those rights. It was never intended by any of the legislation concerning the alienation of state lands that the state should sell the beds of the navigable streams in a way to interfere with their navigability.

2. The testimony clearly demonstrates that in real truth the land in dispute is nothing more than an inequality in the bed of the river, and that for the most part it is directly in the official route of navigation as established by the general government. The officers of the state composing the state land board were imposed upon by the representation that it constituted tide land, and were led into the error of conveying property in a manner and for a purpose which would act as a direct and permanent impediment to navigation. This the state could not do without violating the trust under which it holds the title to such property, and its grantees would take nothing by such a deed.

The right of access to navigable water abutting upon riparian lands is a valuable appurtenance to such

lands, and equity will in good reason give relief
against an instrument designed to prejudice the enjoy-
ment of such appurtenance. Such is the doctrine laid
down in *Sengstacken* v. *McCormac,* 46 Or. 171 (79 Pac.
412). The action of the state land board in conveying
the property was analogous to that condemned by the
Supreme Court of the United States in the *Illinois Cen-
tral Railroad Co.* v. *Illinois,* 146 U. S. 387 (36 L. Ed.
1018, 13 Sup. Ct. Rep. 110). The legislature of the state
of Illinois had passed a law granting to the railroad
company the bed of Lake Michigan along a mile and a
half of the city water front in Chicago, and extending
with that width a mile out into and including the most
of the outer harbor. This law was afterward re-
pealed. The railroad company contended that it had
a vested right by the former act of which it could not
be divested by subsequent legislation; but the Supreme
Court of the United States held that the repeal was a
valid exercise of legislative power, on the ground that
the abrogated law undertook to invest the company
with rights manifestly inimical to navigation and com-
merce, in that it assumed to grant away lands subja-
cent to the navigable waters of the lake. In comment-
ing on this case in *Lewis* v. *Portland,* 25 Or. 133 (35
Pac. 256, 42 Am. St. Rep. 772, 22 L. R. A. 736), Mr.
Chief Justice LORD said:

"There the grant of the submerged soil of the lake
was in such quantity as, in the opinion of the court,
impaired the public interest in its waters, and oper-
ated, if irrepealable, as an abdication by the state of
its trust over the property."

It would seriously unsettle property rights of ripa-
rian owners and work great harm to navigation if it
were permitted that the moment low water should dis-
close a sand bar that is liable to be scoured out by the

next flood, one might apply to the state and get a deed in fee simple for such a place, and be authorized to use it as a basis for exactions against the upland owner.

3. For the reason that what was attempted to be conveyed is in the general course of navigation at that point and mainly within the harbor lines as established by the general government, and that the state had no right to convey the property and so abdicate its trust designed to protect navigation, the decision of the Circuit Court is affirmed, but with the modification that no costs or disbursements will be taxed for or against the defendants Dabney, they having disclaimed in their answer any interest or estate in the tract, although they were the original grantees of the state.

Affirmed and Modified.