Argued June 5, reversed June 14, reconsideration denied July 26, 1978,
petition for review allowed; affirmed February 13, 1979, 285 Or 197
See also 35 Or App 665, 581 P2d 40

MORSE et al, *Petitioners,*

*v.*

OREGON DIVISION OF STATE LANDS et al,
*Respondents,*
*and*
WESTERN BANK et al, *Intervenor-Respondents.*

(CA 10946)

581 P2d 520

See also, 31 Or App 1309, 572 P2d 1075.

Bruce H. Anderson, Eugene, argued the cause for petitioners. With him on the brief were Douglas M. Dupriest and Coons & Anderson, Eugene.

James C. Rhodes, Deputy Attorney General, Salem, argued the cause for respondents Oregon Division of State Lands and William S. Cox, Director of the Division of State Lands. With him on the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, Clarence R. Kruger, Assistant At-

torney General, and Peter S. Herman, Senior Counsel, Salem.

Donald J. Morgan, Portland, argued the cause and filed the brief for respondent City of North Bend.

G. Jefferson Campbell, Jr., Coos Bay, argued the cause and filed the brief for intervenor-respondents.

Before Schwab, Chief Judge, and Tanzer and Roberts, Judges.

TANZER, J.

## TANZER, J.

The issue in this case is whether, under Oregon's Fill and Removal Law, ORS 541.605 to 541.665, the director of the Division of State Lands may issue a permit for an estuarine landfill project which is not for a water-related use.

The City of North Bend applied for a permit to fill 32 acres of the Coos Bay Estuary for the purpose of extending a runway at the North Bend Airport to accommodate Hughes Air West's plan to convert from prop-jet to jet aircraft. The Division of State Lands approved the project and issued a permit on condition that the City undertake a corresponding project to mitigate the loss of estuarial resources caused by the fill.[1] This court vacated the permit because its issuance was inconsistent with the Division's administrative rule requiring that landfill projects be for a water-related activity. *Morse v. Division of State Lands,* 31 Or App 1309, 572 P2d 1075 (1977) *rev den* (1978).[2]

---

[1] In its original order, the Division required that the City mitigate the project's adverse effect on the estuary by scalping a spoil island adjacent to the area to be filled. This would have rehabilitated submerged lands which had been previously filled. Thereafter, on the City's motion, the Division approved an alternative mitigation project which would have returned diked submersible lands to tidal influence. The proposed fill would occupy submerged lands. The Division's supplemental order approving the alternative mitigation project states that comparing the alternative mitigation area to the area to be filled is like "comparing a bushel of apples to a bushel of pears—both desirable, but hardly * * * equivalent." Nevertheless, the present permit is conditioned upon completion of the alternative mitigation project.

[2] In that opinion we stated:

"* * * Such a rule is consistent with and in furtherance of the legislative directive that landfill projects may not 'unreasonably interfere' with the preservation of waters for navigation, fishery and recreational use. ORS 541.625(2)(a). Indeed, the legislative criteria upon which the rule is based may themselves be reasonably interpreted to require that all permitted landfill projects be for water-related or water-dependent uses. In view of the statutory expression of the paramount nature of the public's interest in the maintenance of water resources, it may be that any diminution of those resources which is not necessary or incident to their beneficial utilization would be statutorily

Thereafter, the Division enacted a temporary rule which deleted the requirement of water-related activity.[3] The City of North Bend then renewed its application and, on March 31, 1978, the Division issued a new fill permit to the City. After a contested case hearing the Division entered a final order affirming the issuance of the permit. The Division has stayed all work under the permit pending disposition of this expedited appeal.

The permit now before us is substantially identical to the earlier one. The order incorporates the prior orders by reference and includes an express finding that the airport runway extension is not a water-related activity. Thus, except for the Division's amendment of its administrative rules, the posture of this case is the same as the prior case.

■ The Division of State Lands, being a creature of statute, can act only within its legislative mandate. *Moe v. Division of State Lands,* 31 Or App 3, 569 P2d 675 (1977). The courts will uphold actions which can reasonably be considered in furtherance of the purposes of a statute for the administration of which the

---

proscribed." *Morse v. Division of State Lands,* 31 Or App 1309, 1313, 572 P2d 1075 (1977) *rev den* (1978).
Because the case was decided under the rule, we did not reach the statutory issue.

[3]Former OAR 141-85-205(6) provided:

"Applicants for fill projects must show that the land to be created will be used for a water-related activity * * *."

As amended by temporary rule, the rule now provides:

"(6) Applicants for fill projects must show:
  "(a) How much fill is necessary to accomodate the proposed use.
  "(b) How the land created will be used.
  "(c) Whether or not the project has significant public benefit.
  "(d) Whether or not filling is necessary to carry out the proposed activity.
  "(e) Whether or not the proposed use is consistent with existing land use plans.

"The purpose of this section is to make additional information on fill projects available to the Director and reviewing parties and is not intended to be a limitation on the Director's authority to issue fill permits."

agency is assigned responsibility. In so doing, the court tends to defer to any reasonable policy interpretation of the statute, *Fairview Hospital v. Moore,* 28 Or App 637, 640, 560 P2d 671 (1977), but administrative actions which, as a matter of law, are inconsistent with the statutory purpose are outside the power of the agency and will not be upheld, *see Wasco County v. AFSCME,* 30 Or App 863, 569 P2d 15 (1977). Therefore, we first examine this order to determine whether it can reasonably be deemed to advance the statutory purpose.

The policy of the statutes authorizing and regulating landfills, administered by the Division of State Lands, is stated in ORS 541.610(1) and (2):

"(1) The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for game and food fish, avenues for transportation and sites for public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Division of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state.

"(2) The Director of the Division of State Lands shall take into consideration all beneficial uses of water including streambank protection when administering fill and removal statutes."

ORS 541.605 through 541.665 establishes procedures for the administration of the fill and removal permit program. ORS 541.615(1) requires that a permit be obtained from the director of the Division of State

Lands for any landfill project undertaken in the waters of this state.[4] The criteria upon which applications for permits are to be considered are contained in ORS 541.625, which provides:

"(2) The Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for filling waters of this state. In determining whether or not a permit shall be issued, the director shall consider the following:

"(a) Whether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation;

"(b) Whether the proposed fill conforms to sound policies of conservation and would not interfere with public health and safety;

"(c) Whether the proposed fill is in conformance with existing public uses of the waters; and

"(d) Whether the proposed fill is consistent with a duly enacted zoning or land use plan for the area where the proposed fill is to take place.

"(3) If the director issues a permit, he may impose such conditions as he considers necessary to carry out the purposes of ORS 541.610 and subsection (2) of this section. In formulating such conditions the director may consult with the State Geologist, the State Fish and Wildlife Director, the State Forester, the Director of the Department of Environmental Quality, the administrative officer of the State Soil and Water Conservation Commission, the Director of Agriculture, the State Parks Superintendent, the State Marine Director, the Water Policy Review Board, the State Highway Engineer, the Director of the Economic Development Department and the Water Resources Director. * * *"

---

[4] ORS 541.615(1) provides:

"Except as otherwise specifically permitted under ORS 541.605 to 541.665, no person or governmental body shall remove any material from the beds or banks or fill any waters of this state without a permit issued under authority of the Director of the Division of State Lands, or in a manner contrary to the conditions set out in the permit."

By definition, the term fill means the artificial deposit of 50 or more cubic yards of material. ORS 541.605(5).

[ 858 ]

We are therefore required to determine as a matter of law whether ORS 541.625 allows permits for landfills for other than water-related uses. The statutes appear to be a statement of public trust, but because the statutory words might be regarded as general, we look to their common law antecedents and legislative history.

## COMMON LAW ANTECEDENTS;
### *JUS PUBLICUM* (THE PUBLIC TRUST)

■ In enacting provisions regulating landfills in the state's waterways, the legislature was not writing on a clean slate. Historically, lands underlying navigable waters have been recognized as unique and limited resources and have been accorded special protection to insure their preservation for public water-related uses such as navigation, fishery and recreation. Under the common law public trust doctrine, the public use of such waters could not be substantially modified except for water-related purposes. This protection emanates from the dual nature of the state's original ownership of those resources.

■ Title to land underlying navigable waters devolved on the state upon its admission to the union. *Oregon v. Corvallis Sand & Gravel Co.,* 429 US 363, 97 S Ct 582, 50 L Ed 2d 550 (1977); *Smith Tug v. Columbia-Pac. Towing,* 250 Or 612, 443 P2d 205 (1967). Such title included a full fee simple interest, historically called *jus privatum,* which was qualified by a public trust or *jus publicum.* By the terms of the public trust, submerged and submersible lands were to be preserved for public use in navigation, fishing and recreation. *Shively v. Bowlby,* 152 US 1, 11, 14 S Ct 548, 38 L Ed 331 (1894); *Cook v. Dabney,* 70 Or 529, 532, 139 P 721 (1914).[5] While certain of the state's interests are alienable, its obligation as trustee of the public interest remains. *Corvallis & Eastern R. Co. v. Benson,* 61

---

[5] In *Cook v. Dabney,* 70 Or 529, 532, 139 P 721 (1914), a sale by the State Land Board of dike-created shoal lands was invalidated as violative of the public trust to hold submersible land for purposes of navigation and fishery.

Or 359, 369-70, 121 P 418 (1912); *Brusco Towboat v. State Land Bd.*, 30 Or App 509, 567 P2d 1037 *rev allowed* (1977). Thus, all submerged and submersible lands are subject to the paramount responsibility of the state to preserve and protect the public interest.

Because the trust is for the public benefit, the state's trustee obligation is commonly described as the protection of specified public usages, *e.g.*, navigation, fishery and, in more recent cases, recreation. The severe restriction upon the power of the state as trustee to modify water resources is predicated not only upon the importance of the public use of such waters and lands, but upon the exhaustible and irreplaceable nature of the resources and their fundamental importance to our society and to our environment. These resources, after all, can only be spent once. Therefore, the law has historically and consistently recognized that rivers and estuaries once destroyed or diminished may never be restored to the public and, accordingly, has required the highest degree of protection from the public trustee.

The extent of the judicial protection of the public trust is illustrated by *Illinois Central Railroad v. Illinois*, 146 US 387, 13 S Ct 110, 36 L Ed 1018 (1892), wherein the court held that the state had no power to violate the public trust by conveying the bulk of the land in the Chicago harbor to a private railroad company. By its terms, the transfer forbade any use of the land by the transferee which would obstruct navigation. However, the court held that because the transfer invited commercial exploitation of the harbor, the risk that the water resource would be compromised for the promotion of private enterprise, it was an impermissible abdication of the responsibility of the state as public trustee:

> "The act * * * placed under the control of the railroad company nearly the whole of the submerged lands of the harbor, subject only to the limitations that it should not authorize obstructions to the harbor or impair the public right of navigation * * *. [T]he act put it in

[ 860 ]

the power of the company to delay indefinitely the improvement of the harbor, or to construct as many docks, piers and wharves and other works as it might choose, and at such positions in the harbor as might suit its purposes, and permit any kind of business to be conducted thereon, and to lease them out on its own terms, for indefinite periods. The inhibition against the technical transfer of the fee of any portion of the submerged lands was of little consequence when it could make a lease for any period and renew it at its pleasure. And the inhibitions against authorizing obstructions to the harbor and impairing the public right of navigation placed no impediments upon the action of the railroad company which did not previously exist. A corporation created for one purpose, the construction and operation of a railroad between designated points, is, by the act, converted into a corporation to manage and practically control the harbor of Chicago, not simply for its own purpose as a railroad corporation, but for its own profit generally." 146 US at 450-51.

The court recognized that water-related improvements were permissible as consistent with and in furtherance of the public trust and distinguished such uses from the exploitation which it found impermissible:

" "* * * [T]he * * * lands [are] held by the State * * * *in trust* for the public uses of navigation and fishery, *and the erection* thereon of wharves, piers, light-houses, beacons and other facilities of navigation and commerce. Being subject to this trust, they were *publici juris*; in other words, they were held for the use of the people at large. It is true that to utilize the fisheries, especially those of shell fish, it was necessary to parcel them out to particular operators, and employ the rent or consideration for the benefit of the whole people; but this did not alter the character of the title. The land remained subject to all other public uses as before * * *. It is also true that portions of the submerged shoals and flats, which really interfered with navigation, and could better subserve the purposes of commerce by being filled up and reclaimed, were disposed of to individuals for that purpose. But neither did these dispositions of useless parts affect the character of

[ 861 ]

the title to the remainder.' " (Original emphasis.) 146 US at 457, *quoting Stockton v. Baltimore & New York R. R. Co.*, 32 F 9, 19-20 (DC NJ 1887).

■ The tacit principle underlying the public trust doctrine is that water resources should be devoted to uses which are consistent with their nature and should be protected from inimical uses. To this end courts have distinguished between undertakings which are in furtherance of marine activities, such as the construction of wharves, docks and piers, and upland-related undertakings which consume water resources by adapting them to uncharacteristic uses. Water-related undertakings are consistent with the trust; upland-related undertakings violate the trust. *Illinois Central Railroad v. Illinois; Cook v. Dabney.*

## LEGISLATIVE HISTORY

The purpose of ORS 541.610 and 541.625 was to codify the *jus publicum* and to provide procedures for its orderly administration. The legislative history reflects that the legislature was aware of the historical public trust, was motivated by the same concerns that underlie the public trust, and chose language which would best perpetuate it. Moreover, given the magnitude of protection historically accorded to the public trust, it cannot be inferred that the legislature intended to modify that trust absent explicit language to that effect, assuming for argument that it has power to do so.[6]

The landfill law was introduced in the 1971 legislature by the Senate Fish and Game Committee at the joint request of the Fish Commission and the Game

---

[6] It is not clear whether the legislature is empowered to extinguish the public trust or to modify its terms. It is arguable that because the trust is a qualification on the state's ownership of the waterways, it is not subject to modification by the trustee. *See, Shively v. Bowlby*, 152 US 1, 11, 14 S Ct 548, 38 L Ed 331 (1894); *Illinois Central Railroad v. Illinois*, 146 US 387, 13 S Ct 110, 36 L Ed 1018 (1892); *Cook v. Dabney*, 70 Or 529, 139 P 721 (1914); *Corvallis & Eastern R. Co. v. Benson*, 61 Or 359, 121 P 418 (1912). It is also arguable that the legislature, as representative of the public as beneficiaries, may modify the terms of the trust. We do not reach this issue.

Commission. The regulatory provisions were grafted onto existing statutes which regulated removal of material from the waterways. The introductory statement of the bill's proponents expresses its purpose to substantially restrict the filling of waters and, in particular, the filling of estuarine resources.

> "Improved regulatory powers over filling are needed to protect the natural values of our waterways. Fish, wildlife, recreational, and other environmental resources of the estuaries and rivers are presently suffering severe and permanent damage from landfills made for various purposes including development of industrial, residential, and commercial sites.
>
> "* * * * *
>
> "To illustrate the seriousness of the filling problem, Oregon's 13 primary estuaries, excluding the Columbia, have lost a total of approximately 4,000 of 24,000 tideland acres since 1930. This represents about a 16 percent reduction of the total tidelands of our estuaries. Individual estuaries have suffered losses ranging from less than 1 percent to 35 percent. The loss of these tidelands is extremely significant since they are the most productive part of an estuary to coastal fish and wildlife resources." *Joint Statement of the Fish Commission of Oregon and the Oregon State Game Commission supporting Senate Bill 224,* Minutes of Senate Committee on Fish and Game (March 9, 1971).

Although the legislation applied to landfills in all of the state's waterways, the legislators consistently focused upon the bill's impact on tidelands. In public hearings, the landfill law was usually considered in conjunction with a bill creating a coastal planning commission. The tenor of discussion before Senate and House committees considering the legislation indicates an intention to effectuate the public trust by foreclosing further conversion of estuarine resources to upland uses.[7]

---

[7] *See, e.g.,* Minutes of the House Natural Resources Committee (May 5 and May 12, 1971); Minutes of the Senate Fish and Game Commission (April 6, 1971).

The member of the House of Representatives who presented the proposed landfill law to the House Natural Resources Committee explained that the bill was conceived in Coos Bay in response to a proposal by Weyerhaeuser Company to fill in part of the estuary in order to build a dry log storage area. The representative stated unequivocally that such fills would be precluded by enactment of the proposed legislation.

"This [law] will stop any filling of estuaries. It will be the most important part; far more important than S.B. 687, [relating to creation of a coastal planning commission] or anything else that we do as far as controlling what is done in the estuaries." *Explanation of S.B. 224,* Minutes of House Natural Resources Committee (May 5, 1974).

In their final form, the criteria enumerated in ORS 541.625(2), which are to be considered in issuing landfill permits, are essentially those which were recommended by the then attorney general.[8] The criteria were developed as a means of insuring that the director's decision to issue a landfill permit would be consistent with the public trust. In oral testimony and written statements, the attorney general carefully explained the *jus publicum* and the *jus privatum* and the importance of developing express legislative standards by which landfills are to be regulated. More to the point, he advised that such standards must be consistent with the public trust to be legally valid. In his testimony and in his draft Attorney General's

---

[8]The criteria proposed by the attorney general were as follows:

"* * * [T]he Director of the Division of State Lands may issue a permit applied for under ORS 541.620 for filling waters of this state if he determines that:

"(a) The proposed fill does not interfere with the paramount policy of this state to preserve the scenic beauty of its waters and their use for navigation, fishing and public recreation;

"(b) The proposed fill conforms to sound policies of conservation and would not interfere with public health and safety;

"(c) The proposed fill is in conformance with existing and possible future public uses of the waters;

"(d) There is an existing zoning or land use plan for the area where the proposed fill is to take place and such fill is consistent therewith."

Opinion which was made a part of the legislative record and discussed in committee,[9] the attorney general advised that the legislature could not modify or extinguish the public trust (*see* n 6). Thus, if the landfill law was inconsistent with the trust, it would likely be invalidated by the courts.

"We are not in any position to define precisely what all these [*jus publicum*] rights are, but I think we are in the position that we should have to advise the agencies that we represent, which include the State Land Board and various other agencies of state government, that there is a good likelihood that, considering the trend of the law and considering the trend of the time, the courts are going to continue to expand the doctrine but the Oregon courts will follow noted decisions in other states which have expanded and say that anything that affects the recreational use of our waters in this state or any kind of fill that would affect those who use it, is not permissible and is an inalienable right of the public which can be enforced either through a public official or by private action.

"This means that in this posture, if SB 224 passes in its present form, or even with the amendments I have to date, and one of those sets of amendments say that (concern for the public interest) is one of the standards

---

[9]The draft opinion ultimately became 35 Op Atty Gen 844 (1971), which states at page 868:

"[ORS 541.625(2)] (1) codifies the common law concept of the *jus publicum* in navigable waters which we have been discussing, (2) goes beyond common law by also restricting fills to those that are consistent with standards of conservation and zoning, and (3) reposes in the executive, rather than in the courts by default, the primary responsibility of protecting the state's waters and public rights therein, the actions of the Director of the Division of State Lands and the State Water Resources Board under Chapter 754 are subject to review by the courts. Section 5(4), ch. 754 (1971) Or. Laws, amending ORS 541.625, and section 18, ch. 734 (1971) Or. Laws 1782 amending ORS 183.480. The courts in our opinion in construing and applying ORS Chapter 754 will treat that statute as incorporating the common law principles of public use of navigable waters which we have outlined herein."

The opinion goes on to set out some hypothetical examples of landfills which are permissible because done in conjunction with general improvements to the water-related uses which more than compensate for the interference caused by the landfill. Depending upon the circumstances, such results are inconsistent with the attorney general's advice to the Division of State Lands in this case. *See* n. 13. *post.*

the State Land Board must follow in granting permits for fills so that it does not interfere with the rights of navigation and fishery. I think we would almost have to advise the Boards that it would be questionable whether *any* fill doesn't interfere with that right. Secondly, if SB 224 didn't pass, we're going to be left in a very difficult situation. We'll certainly have to advise the Land Board as to lands that they control *now*, that they should not grant any permits for any kind of fill not matter what its purpose would be, and secondly we will probably have to institute a considerable amount of litigation to try to determine what the law is, and to get this question settled. * * *" Remarks of Attorney General Lee Johnson, House Subcommitte on Natural Resources (May 12, 1971).

■ One supporter of the bill asserted his understanding that the legislature could if it so chose modify the *jus publicum*, but that these statutes did not.[10] The adoption of the criteria recommended by the attorney general for the express purpose of harmonizing the landfill law and the public trust doctrine clearly demonstrates that the legislature intended such harmony.

In light of the foregoing, we conclude that the landfill provisions of ORS chapter 541 and, in particular ORS 541.625, are a codification of the public trust doctrine. The legislation establishes a procedure by which the propriety of all proposed landfill projects can be evaluated, in light of the trust, by a centralized authority. It also insures that a decision as to each landfill will be made before the project is commenced so that the irreversible damage of improper landfills can be prevented and so that the expense of removing

---

[10] *See*, Comments of Representative Magruder, Minutes of House Natural Resources Committee (May 5, 1971), at p. 2:

"*Rep. Magruder* said that the Attorney General's advisory opinion says that the legislature does not have the power to extirguish the 'jus publicum rights' (public servitudes) which the public has. But *he* believed it *is* in the power of the legislature to do this, but said it has not been done in the bill." (Original emphasis.)

fills subsequently held to be public nuisances is avoided.[11]

We also note that the Division itself has, until now, construed the statute—regardless of the now repealed rule—to bar landfills for other than water-related uses[12] and was so advised by the attorney general in this case.[13]

---

[11] By statute, a landfill authorized by permit from the Division of State Lands is presumptively consistent with the public trust. ORS 541.665 provides:

> "If the director issues a permit to fill pursuant to ORS 541.605 to 541.665, it shall be presumed that such fill does not infringe upon the public rights of navigation, fishery or recreation, and the public rights to lands created by the fill shall be considered extinguished."

[12] The record reflects that, before this case arose, the Division of State Lands had construed ORS 541.625(2) to require that permitted landfills be water-related and that the Division had denied permit applications based upon this construction. In a letter to Mr. William D. Lillebo dated July 25, 1977, the director denied an application to fill in part of Scholfield Creek in order to build a parking lot. The letter explained:

> "A parking area is not a water-dependent use and, hence, conflicts with [ORS 541.625] (2) (a) and (b) * * *. Therefore, we must deny this portion of your application."

On another occasion, the director denied an application to fill in part of the Willamette River in order to landscape the applicant's backyard because "any filling for a nonwater-oriented use is contrary to sound river management practices and to state policy."

[13] "* * * [I]t would be our opinion that you do not have authority to issue the permit under ORS 541.625(2). It is clear from the statements that the fill would interfere with navigation, fishing and public recreation use of the estuary. The only offsetting public benefit would be the need for a continued air service to the area. The statute makes it clear that the latter consideration is not relevant. The only type of fill that is permitted are those which either promote or at least would not injure the navigation, fishing and public recreation use. In enacting ORS 541.625 the legislature clearly intended to limit fills for these purposes. * * *

> "[Issuance of the permit *may* be permissible if it is] subject to conditions which would substantially mitigate the injury to navigation, fishing and public recreation * * *.

> "We cannot say that the latter conclusion is totally free from doubt. It can be argued that the trade-off contemplated by such a condition is not valid because it is not a water dependent use that is proposed. * * *" Letter of Attorney General Lee Johnson to William S. Cox, Director of the Division of State Lands (April 19, 1976).

■ The common law principle that substantial non-water-related undertakings are impermissible is specifically codified in ORS 541.625(2)(a) and (c). Those sections respectively provide that in determining whether to issue a permit, the director shall consider "[w]hether the proposed fill unreasonably interferes with the paramount policy of this state to preserve the use of its waters for navigation, fishing and recreation," and "[w]hether the proposed fill is in conformance with existing public uses of the waters." A major landfill undertaken to accommodate an upland use, *i.e.*, a nonwater-related use such as the airport runway extension project authorized by this order, is inconsistent with both of these criteria and, therefore, is impermissible under the statute and beyond the statutory authority of the Division.

Accordingly, we hold that the director erred in approving the issuance of the fill permit.

Reversed.