Argued and submitted February 2, affirmed April 13, reconsideration denied May 27, petition for review denied June 29, 1983 (295 Or 259)

OREGON SHORES CONSERVATION
COALITION et al,
*Petitioners,*

*v.*

OREGON FISH AND WILDLIFE
COMMISSION et al,
*Respondents,*
*and*
OLSON et al,
*Intervenor - Respondents.*

(CA A25851)

662 P2d 356

Steven R. Schell, Portland, argued the cause for petitioners Oregon Shores Conservation Coalition, Audubon Society of Portland, Bill Bess, Lavern K. Holstad, Alfred Krampert, Jim Lore, Michael, Sally, Tyler and Arnadene Vanebo, and Daniel Pickthorn and Jeff Gilligan. With him on the brief were Black, Helterline, Beck & Rappleyea, and James S. Coon, Portland.

James S. Coon, Portland, argued the cause for petitioner Oregon Environmental Council. With him on the brief were Steven R. Schell, and Black, Helterline, Beck & Rappleyea, Portland.

Mary J. Deits, Assistant Attorney General, Salem, argued the cause for respondents. With her on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

David A. Rhoten, Salem, argued the cause for intervenor - respondents. With him on the brief was Rhoten, Rhoten & Speerstra, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioners appeal from the order of the Fish and Wildlife Commission (Commission) granting a permit to three oyster growers, the intervenors-respondents here, to treat certain leased oyster beds in Tillamook Bay with Sevin 80 Carbaryl insecticide (Sevin). ORS 509.140. Petitioners contend: (1) the Commission failed to comply with the Special Local Needs Registration and Labeling requirements for the use of Sevin; (2) the order violates ORS 509.505, which prohibits depositing any substance injurious to shellfish into the water; (3) the Commission erroneously interpreted "necessary" in ORS 509.140(2) as "reasonably necessary"; and (4) the Commission failed to consider the public trust doctrine in granting the permit. We affirm.

The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 USC § 136 (1965) *et seq.*, regulates the registration, distribution and use of pesticides. Section 24(c) of the Act, 7 USC § 136v, authorizes states to register and allow use of pesticides to meet special local needs for which a federally registered pesticide product is not available. Prior to registering, the state is required to submit proposed labeling accompanying the pesticide that contains information specified by the Act and regulations. 40 CFR § 162.10. State registration is subject to review and validation by the Administrator of the United States Environmental Protection Agency (EPA). Once approved, state registration is considered a federal registration; however, distribution and use of the pesticide is authorized only within the registering state. 7 USC § 136v(c)(1) (Supp V, 1981).

On May 12, 1980, the Oregon Department of Agriculture (ODA), the agency responsible for state registration of pesticides, notified EPA that it had established a Special Local Needs Registration for the use of Sevin to control intertidal mud and ghost shrimp in estuarine oyster beds.[1] The product labeling accompanying Sevin provided in part:

---

[1] As the Commission noted in its order:

"7. The adult mud and ghost shrimp dig U-shaped burrows 2-4 cm in diameter, up to 1 meter deep, in mud/sand substrate. The burrowing of

"* * * Treatment must be timed seasonally to avoid major concentration of Dungeness crabs. Treatment is not allowed until the ground becomes bare at ebb tide * * *.

"A special permit must be obtained from the Oregon State Department of Fish & Wildlife prior to the application. All permits must be screened by the Department of Fish & Wildlife with a physical inspection prior to issuance to determine that treatment would be worthwhile and effective, that the ground is bare of oysters, that the ground is properly staked and flagged, and to protect adjacent shellfish and water areas. The actual treatment must be conducted under the direct supervision of a staff member of the Oregon Department of Fish & Wildlife."

On February 6, 1981, EPA validated the state registration with the following conditions:

"1. That the treatment will be limited only to areas of significant need. To that end, every tract will be carefully examined to ensure that a need exists.

"2. Applications are to be limited to areas of 200 feet or more from channels and sloughs (water) and treatment will be done only at low tide when the ground is bare so that the pesticide will not be placed directly into the water. Aerial applications will not be made at wind speeds greater than 10 mph.

"3. Application will be permitted only during time (July and August) of reduced abundance of crabs in the general area, since crabs are the primary shellfish species that could be adversely affected.

"4. Spraying over commercial oyster crops is not permitted. The treatment will be made during absence of oysters requiring a minimum of 5 days prior to seeding of any oysters on the bed following treatment. After carbaryl application and oyster seeding, a minimum of 3 years will be required before harvesting the oysters.

"5. Treatments are to be limited to a maximum of 300 acres per year.

_____

the shrimp physically softens the bottom mud, and causes deposition of excavated fines on the bottom surface. As a result, cultch and older oysters may sink into the bottom or become covered with castings. This reduces growth and survival of oysters through interference with respiration and feeding. Significant population densities of mud and ghost shrimp will create conditions where is is not possible to grow oysters by bottom culture. * * *"

"6. Treatments in excess of 50 acres are to be applied at intervals.

"7. No more than two treatments of carbaryl per given area (or section) are to be made in consecutive years and a three year no-treatment interval prior to retreatment.

"8. A monitoring program to observe changes in the planktonic and benthic populations in the use area will continue throughout the 24(c) registration.

"9. A tolerance(s) or an exemption(s) from tolerance will be required on all commercially harvested edible marine species. Information concerning this requirement can be obtained by contacting me at (703) 557-7024.

"10. Other molluscs capable of co-habitating with the burrowing shrimp should be investigated as possible commercial alternatives to the oyster species in current production.

"11. All spraying will be conducted under the immediate supervision of the Department of Fisheries' employees who are empowered to halt the operations should unforeseen crab abundance or potential wind drift produce circumstances unsuitable for the treatment."

ODA accepted the EPA conditions but requested that the months of Sevin application in restriction Number 3 be changed from July and August to June and July, months more favorable to reduced crab population. No response from EPA concerning this request was received.

On May 28, 1982, three oyster growers applied to the Commission for a permit for Sevin treatment on approximately 140 acres[2] of commercial oyster beds in Tillamook Bay to reduce the mud and ghost shrimp population. The permit was sought pursuant to ORS 509.140:

"(1) Whenever in the course of removing any obstruction in any waters of this state, or in constructing any foundations for dams, bridges or other structures, or in carrying on any trade or business, any person, municipal corporation, political subdivision or governmental agency

---

[2] The applicants originally sought treatment of 190 acres, but they amended their petition to request treatment of 139.3 acres. That represents approximately three percent of the 4,163 intertidal acres identified for Tillamook Bay.

desires to use explosives or any substances deleterious to fish, such person, municipal corporation, political subdivision or governmental agency shall make application to the commission for a permit to use the explosives or substances in such waters.

"(2) If the commission finds it necessary that the explosives or substances be used, it may make an order granting such person, municipal corporation, political subdivision or governmental agency the right to use the explosives or substances and shall:

"(a) Designate the places and period within which the explosives or substances may be used; and

"(b) Prescribe such precautions as will save fish from injury.

"(3) It is unlawful to disregard such order or fail to obtain such order or permit before using explosives or substances deleterious to fish."

Following notice of a hearing date, petitioners requested and were granted intervenor status. On June 8 and July 20, 1982, the Oregon Department of Fish and Wildlife (ODFW) inspected the sites requested for treatment and issued a report of the inspection on July 24, 1982, the day of the hearing. At the hearing, evidence and testimony were received from the applicants, petitioners, ODFW staff members and members of the public. The Commission entered its order granting the permit on August 19. Petitioners requested and were denied a stay of that order pending appeal.[3]

■ Petitioners first contend that the order is not supported by substantial evidence, because it fails to comply with the registration requirements for the use of Sevin. Specifically, petitioners argue that *prior to the issuance* of the permit: (1) all of the sites were not bare of oysters; (2) all of the sites were not properly staked or flagged; (3) a portion of one site was covered with one to three inches of standing water at lowtide; and (4) another site was not inspected. We agree that those sites not conforming with the registration and product labeling requirements cannot be treated in their present state. The Commission's order, however, does not allow unconditional treatment of all sites

---

[3] Apparently, no spraying is contemplated until late May or early June, 1983.

requested by the applicants. Rather, it provides, in pertinent part:

> "The permit application is hereby granted for treatment of areas 2A, 2B, 2C, 3B, and 4A in the locations shown on Attachment B, *on the following conditions:*
>
> "1. The treatment shall be under the inspection, supervision and control of the Department of Fish and Wildlife. *The staff* of the Department *shall have the authority to halt the spraying operation should unforeseen crab abundance,* potential wind drift *or any other conditions* produce circumstances unsuitable for treatment to take place.
>
> "* * * * *
>
> "4. *The conditions of treatment shall be consistent with all requirements of the EPA registration label and the Special Local Need Registration.*
>
> "5. *No area shall be treated that has not been inspected by the staff of the Department prior to treatment.*
>
> "6. *No area shall be treated at a time when there is any surface water in the treated area.*
>
> "* * * * *
>
> "10. The treatment shall take place at a time of optimum tide as determined by the Department. *Treatment will be done only at low tide when the ground is bare and the pesticide will not be placed directly in the water.*
>
> "* * * * *
>
> "12. *Buffer strips* around bodies of water or oyster crops *shall be established by the Department and clearly marked under the supervision of the Department staff just prior to treatment.* Treatment areas must be at least 200 feet from channels and sloughs.
>
> "13. All areas to be treated *shall be free of oyster crops and seed oysters at the time of treatment.* Oyster beds shall not be seeded within five days following treatment.
>
> "14. This permit may be canceled by the Director of the Department of Fish and Wildlife at any time he determines that any terms or conditions of the permit have been violated by the applicants.
>
> "* * * * *" (Emphasis supplied.)

The order requires that all prerequisites for Sevin treatment be met prior to the actual spraying rather than at the date the permit is issued. Contrary to petitioners' argument, the conditional permit ensures greater protection for the environment and non-target species by requiring that the registration and labeling standards be met at the time of actual spraying rather than at the date the permit is considered — here some eleven months prior to the contemplated treatment.

■　　Petitioners also argue that the order should be set aside, because it does not require Sevin treatment during the months of June, July and August (the months EPA and ODA earlier recognized as having the least crab abundance). At the hearing, evidence was presented that those months were *not* the most favorable months for reduced crab population. Thus, the Commission's order provides:

"3.　The treatment shall be at a time of year when there is the least abundance of crab and other marine life in the estuary. The appropriate time of year shall be determined by the Department. Applicants shall be responsible for obtaining any necessary modification of the Special Local Need Registration."

That condition ensures satisfaction of the primary concern of both EPA and ODA: protection of crabs. Under the order, Sevin spraying is not permitted at *any* time during an abundant crab population, including June, July and August. Treatment is allowed only when ODFW determines the crab population to be at its lowest. Should those months be other than June, July and August, the oyster growers are required by the terms of the permit to obtain prior EPA modification of the registration and labeling standards.

■　　Petitioners assert that EPA monitoring standards have not been met. Specifically, the EPA restriction requires:

"8.　A monitoring program to observe changes in the planktonic and benthic populations in the use area will continue throughout the 24(c) registration."

Petitioners argue that, at the very least, there must have been continuous monitoring since March 16, 1981, the date

of ODA's acceptance of EPA's conditions for Sevin registration. On the March 16 date, the Commission had not granted any permits for the use of Sevin under the registration. The first application is the one presently before us. The Commission's authorization on *this* application triggers the necessity of establishing a rigorous monitoring program. Of course, effective monitoring of the impact of Sevin treatment on the plankton and benthic population requires that the program be established in advance of the treatment. The order, however, provides for early monitoring:

> "9. The applicants shall permit pre and post treatment monitoring by Department staff to observe changes in the plankton and benthic populations in the use area during the time of 24(c) registration."

 In their second assignment of error, plaintiffs contend that the order violates ORS 509.505:

> "It is unlawful for any person, municipal corporation, political subdivision or governmental agency to deposit or allow to escape into, or cause or permit to be deposited or escape into any public waters of this state, any substance of any kind which will or shall in any manner injuriously affect the life, growth or flavor of shellfish in or under such waters."

Evidence presented at the hearing establishes that Sevin kills not only shrimp but Dungeness crab as well, both "shellfish" under ORS 506.011(4). Because ORS 509.140 permits "necessary" use of substances "deleterious to fish," petitioners contend that the two statutes are in conflict, and ORS 509.505, prohibiting only deposits of substances harmful to shellfish, is the more specific of the two and should control. Respondents urge, however, that such an interpretation would produce an absurd and unreasonable result: any activity, including dam and bridge projects, which negatively impacts on shellfish would be prohibited. They contend that a more reasonable interpretation is that ORS 509.140, allowing the use of substances deleterious to fish, including shellfish, only under certain circumstances, is the exception to ORS 509.505.

When construing statutory provisions, it is the duty of the court to "discern and declare" the intent of the legislature. *Whipple v. Howser,* 291 Or 475, 479, 632 P2d

782 (1981); *Fifth Ave. Corp. v. Washington County,* 282 Or 591, 596, 581 P2d 50 (1978); *see also* ORS 174.020. In determining legislative intent, inquiry begins with the language of the statutes. *Whipple v. Howser, supra.*

We agree that the language of the statutes is ambiguous. ORS 509.140 appears to permit, at least in part, what ORS 509.505 prohibits. Although both interpretations urged by the parties appear equally plausible, we conclude that ORS 509.140 is the exception to the general prohibition contained in ORS 509.505 and, under ORS 174.020,[4] controls. The legislature delegated to the Commission exclusive jurisdiction over all fish and shellfish, ORS 506.036(1), as well as a duty to protect, preserve, propagate, cultivate and develop all fish under its jurisdiction.[5] ORS 506.036(2). Given that delegation of broad, comprehensive power, it is more likely that the legislature intended that the Commission have exclusive authority to determine whether the use of *any* substance deleterious to fish, *including shellfish,* is necessary. Contrary to petitioners' contention, this interpretation does not ignore ORS 509.505 but rather carves out a careful exception to the general prohibition against depositing any substances harmful to shellfish into the waters. Such an act is permissible (1) only when removing obstructions in the water, constructing foundations for structures or carrying on a trade or business and (2) only if the Commission finds it necessary.

■■ ■■ Next petitioners contend that the Commission erred in construing the term "necessary" in ORS 509.140(2) as "reasonably necesssary" rather than "indispensable." In its order, the Commission concluded:

"1. The term 'necessary' as used in ORS 509.140 is interpreted to mean 'reasonably necessary.' It is our

---

[4] ORS 174.020 provides:

"In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and a particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

[5] ORS 506.036(3) divests the Commission of its regulatory authority and jurisdiction over commercial cultivation of oysters; however, it does not affect the Commission's authority under ORS 509.140.

belief that this interpretation of the term best carries out the intent of the Legislature in enacting this statute. Specifically, the law is designed to allow persons to take actions which they need to carry out their trade or business so long as the Commission determines, in its discretion, that such action is consistent with applicable general standards, such as legislative policy relating to the management of the resources and the statewide planning goals, and adequate precautions to protect fish from injury are available."

Petitioners, citing *Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980), argue that "the term 'necessary,' being inexact, but the legislature having expressed a completed policy judgment as to the permit, it is for the court to decide the meaning of the term in the context of the statute." They contend that an appropriate dictionary definition of the term equates it with indispensable. As noted earlier, ORS 506.036 grants the Commission exclusive jurisdiction over all fish within the waters of the state. Additionally, ORS 509.140 confers broad authority to the Commission to determine whether a substance harmful to fish may nonetheless be used in the waters. If the Commission determines that the substance is "necessary," it "may" issue a permit, although it is not required to do so. We conclude that the term "necessary" expresses non-completed legislation and authorizes the Commission to refine the general policy of the statute by applying that policy to specific factual settings. Once the Commission interprets the law, as it has here, it is this court's function to determine whether that interpretation is within the range of discretion allowed by the general legislative policy of the statute. *Springfield Education Assn. v. School Dist., supra,* 290 Or at 228-30.

We conclude that the Commission's interpretation of the term is consistent with the statutory policy. As the Commission noted, ORS 509.140 recognizes the necessity for commercial activity which might adversely affect fish and authorizes that activity if the Commission finds that adequate precautions are taken to protect fish. Here the Commission, vested with broad authority under ORS 509.140, determined that the issuance of a permit to use Sevin was "reasonably necessary" for the applicants to

carry on their oyster business. As we read the statutory scheme, that interpretation is within the range of discretion afforded the Commission.

■ Petitioners also argue that the necessity that must be shown is necessity for the public and not for the private interests of the oyster growers. It is clear from the context of the term, as well as the general purposes of the statute, that the issue of necessity relates to whether the pesticide application is necessary to the activity specified in the statute; in this instance the commercial oyster growing activity.

■ ■Petitioners further contend that the finding of "necessity" was not supported by substantial evidence in the record. Although the evidence presented was conflicting, we may not substitute our judgment for that of the Commission or reweigh the evidence. Rather, we are confined to determining whether the record discloses facts from which the conclusion drawn by the Commission could be reached by reasonable minds. *Bay v. State Board of Education,* 233 Or 601, 605, 378 P2d 558 (1963); *Home Builders v. Metro Service Dist.,* 54 Or App 60, 62, 633 P2d 1320 (1981).

There was sufficient evidence introduced that Sevin is effective in controlling mud and ghost shrimp that infest oyster beds and that, without the use of Sevin, oyster production would be severely reduced.[6] Although there was evidence presented of alternatives to reduce the mud and ghost shrimp population without the application of Sevin, the evidence as to the practicability of using those alternatives in Tillamook Bay was conflicting.[7] Accordingly, we

---

[6] Petitioners also argue that it was necessary to present evidence showing a quantifiable positive impact on oyster production from Sevin treatment and an assessment of effects on microscopic life. Neither showing is required under the statute.

[7] The Commission made the following finding concerning alternative methods for controlling mud and ghost shrimp by means other than Sevin application:

"11. There are alternative methods for culture of oysters. These alternatives are raft-culture, rack-culture, and stake-culture. These alternatives would increase costs of production substantially, since they are labor-intensive and would require additional investment for facilities. Raft-culture is not practical in Tillamook Bay since it requires deep water.

conclude that the Commission's finding as to the necessity of Sevin was supported by substantial evidence.

Finally, petitioners argue that the Commission erred in failing to consider the public trust doctrine. That doctrine provides that submerged and submersible lands are preserved for public use in navigation, fishing and recreation. *Morse v. Division of State Lands,* 34 Or App 853, 859, 581 P2d 520 (1978), *aff'd* 285 Or 197, 590 P2d 709 (1979). The state, as trustee for the people, bears the responsibility of preserving and protecting the right of the public to the use of the waters for those purposes.[8] It is unnecessary to apply that common law doctrine here, because the legislature has specifically addressed the rights to lands designated as oyster lands. ORS 511.640 provides:

> "All the tidelands and lands under the waters of Tillamook Bay in Tillamook County which are located as oyster claims as provided by law, are withdrawn from the lands of this state which may be sold, are designated as oyster lands, and are set aside for the location of artificial oyster claims. However, all such lands are subject to the provisions of ORS 622.210 to 622.300 and 622.320."

ORS 622.320 defines the public and private rights in such lands:

> "Any plats of oyster lands held by citizens of this state, if distinctly marked out by means which do not obstruct navigation, and not exceeding the extent allowed by regulations, shall be deemed and protected as private property. *Such plats, however, shall not restrict the rights of the public to the use of the waters of this state in a normal and customary manner."* (Emphasis supplied.)

---

The installations take up surface space and could interfere with navigation. Rack-culture and stake-culture might accelerate sedimentation in these shallow intertidal areas. Further, facilities required for these alternative methods of culture would be subject to damage from logs, debris and ice during flood conditions. These alternative methods may damage or interfere with eelgrass growth which would be counterproductive in that eelgrass is a major natural element which firms the intertidal substrate. Permanent structures required by any of these alternative methods would detract from the natural appearance of the estuarian environment."

[8] For a history of the public trust doctrine, *see Brusco Towboat v. State Land Bd.,* 30 Or App 509, 567 P2d 1037 (1977), *aff'd as modified* 284 Or 627, 589 P2d 712 (1978).

The Commission made specific findings that the application of Sevin, pursuant to the conditions of the permit, would have little impact on other aquatic organisms and plant life in areas adjacent to the area to be sprayed. Any adverse impact, it found, would be of a limited, temporary nature. It also found that there would be insignificant impact on the recreational use of the area and that the application of Sevin would enhance continued biological productivity of the estuary. Those findings are supported by substantial evidence. Accordingly, the Commission properly considered the right of the public to the use of the waters.

Affirmed.