Argued and submitted May 18, 2015, vacated and remanded May 3, petition for review allowed October 5, 2017 (362 Or 38)

Mark KRAMER
and Todd Prager,
*Plaintiffs-Appellants,*

*v.*

CITY OF LAKE OSWEGO;
and the State of Oregon,
by and through the State Land Board
and the Department of State Lands,
*Defendants-Respondents,*

*and*

LAKE OSWEGO CORPORATION,
*Intervenor-Respondent.*

Clackamas County Circuit Court
CV12100913; A156284

395 P3d 592

Henry C. Breithaupt, Judge pro tempore.

Gregory M. Adams argued the cause for appellants. With him on the briefs were Richardson Adams, PLLC, Thane W. Tienson, P. C., and Landye Bennett Blumstein LLP.

Paul W. Conable, argued the cause for respondent City of Lake Oswego. With him on the brief were Robyn Aoyagi, Steven D. Olson, and Tonkon Torp LLP.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent State of Oregon. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Brad S. Daniels and Stoel Rives LLP filed the brief for respondent Lake Oswego Corporation.

Kenneth Kaufmann filed the brief *amicus curiae* for Law Professors and Willamette Riverkeeper.

Brian T. Hodges filed the brief *amicus curiae* for Pacific Legal Foundation.

Before Armstrong, Presiding Judge, and Egan, Judge, and Haselton, Senior Judge.

## ARMSTRONG, P. J.

Plaintiffs appeal a judgment dismissing their amended complaint for declaratory and injunctive relief under the Uniform Declaratory Judgments Act, ORS 28.010 to 28.160, relating to public access to the waters of Oswego Lake and adjoining Lakewood Bay (collectively the lake) for recreation. The complaint—brought against the City of Lake Oswego (city), the State of Oregon (state), and Lake Oswego Corporation (LOC)[1]—challenged a city ordinance, Resolution 12-12, that prohibits the public from entering Lakewood Bay from three city parks located adjacent to the lake, as well as a city policy limiting use of a city-owned swim park on Oswego Lake to city residents (the swim-park rule). Plaintiffs alleged three claims for relief, requesting declarations that Resolution 12-12 and the swim-park rule are preempted by the public-use and public-trust doctrines (claims one and two) and that they violate Article I, section 20, of the Oregon Constitution (claim three). In connection with those claims, plaintiffs also requested declarations regarding ownership of the lake bed and the rights of the public and the obligations of the city and state regarding recreational use of the lake under the public-use and public-trust doctrines. They further sought to enjoin enforcement of Resolution 12-12 and the swim-park rule and to enjoin the city and the state to meet their public-trust obligations regarding public access to the lake.

The trial court granted defendants' motions for summary judgment and denied plaintiffs' motion for partial summary judgment and defendant LOC's motion to dismiss. It then entered judgment for defendants on all claims and dismissed plaintiffs' claims with prejudice. In their first and second assignments of error on appeal, plaintiffs challenge those rulings, raising a variety of arguments. As explained below, we generally reject plaintiffs' challenges; however, because the trial court erred in dismissing the case rather than entering a declaration as to the parties' rights, we vacate and remand for the court to enter a declaratory

---

[1] LOC was not named as a defendant in the original complaint, but it was subsequently allowed to intervene as an intervenor-defendant. We refer to the city, the state, and LOC collectively as defendants.

judgment. We reject plaintiffs' third assignment of error without discussion.[2]

## I.  FACTS AND PROCEDURAL HISTORY

Although most of the property surrounding the lake is privately owned, the city, a home-rule municipality, owns or has an easement interest in four properties located adjacent to the lake. Three of those properties are adjacent to Lakewood Bay—Millennium Plaza Park, Sundeleaf Plaza, and the Headlee Walkway. In 2012, based on public safety, environmental, and liability concerns, the city adopted Resolution 12-12, prohibiting entry to the lake from those three city properties. Specifically, Resolution 12-12 amended the city's "Policies Governing the Use of City Owned Park and Recreation Facilities" to add the following new subsections:

"19.  Entering Oswego Lake from Millennium Plaza Park, Sundeleaf Plaza or the Headlee Walkway

"It is prohibited for any person to enter Oswego Lake from Millennium Plaza Park, Sundeleaf Plaza or the Headlee Walkway by any means or method, including, without limitation, by wading or swimming, or by using water vessels or other floatation devices.

"20.  Leaving the Pathway Portion of the Headlee Walkway

"It is prohibited for any person to leave the pathway portion of the Headlee Walkway when using that facility, or to climb, traverse or occupy the fencing or the planted areas adjacent to the path."

(Underscoring in original.) The city also constructed physical barriers to water entry at Millennium Plaza Park and the Headlee Walkway and erected a sign at Millennium Plaza Park saying "Private Lake" and instructing people to stay on the land.

The fourth property is a small swim park located on Oswego Lake.[3] The city acquired title to the park in the

---

[2] In that assignment, plaintiffs contend that the trial court abused its discretion in denying plaintiffs' motion to amend the complaint "to include additional allegations regarding [LOC's] private rules and restrictions prohibiting the public's use of the Lake."

[3] The swim park is open in July and August only, for limited hours.

1930s from The Oregon Iron & Steel Company (Oregon Iron & Steel), LOC's predecessor, subject to certain covenants and restrictions. One of those covenants provided that the property was to "be used and enjoyed by the resident children of the City of Oswego for recreational purposes and for no other purpose." A reversionary clause in the deed provides that, if the city fails to comply with the deed restrictions, the title "shall revert" to Oregon Iron & Steel. The city's swim-park rules provide, among other things, that the swim park is open only to city residents.

Oregon Iron & Steel created the residential development around the lake, reserving the riparian rights and privileges relating to water access from the upland parcels that it sold. It transferred those reserved riparian rights and privileges to LOC in 1942. LOC has managed all access, safety, and other private regulations associated with the lake since that time, and it is responsible for the physical management of the lake. LOC is "owned" by its shareholders—consisting of approximately 700 waterfront property owners and 20 easement associations of about 3,415 upland property owners throughout the city. LOC shareholders and easement owners contribute annual dues to support the lake's management and maintenance. In exchange, they are provided limited access to the lake; they are also subject to LOC's bylaws, rules, and regulations.

Plaintiffs filed the present action challenging Resolution 12-12 and the swim-park rule. Plaintiff Kramer, who is not a resident of the city, had kayaked on the lake up until the adoption of Resolution 12-12 by entering the lake from city-owned property. Plaintiff Prager, who is a resident of the city, had swum in the open waters of the lake but had discontinued doing that after the passage of Resolution 12-12. Their operative complaint—the second amended complaint—purportedly asserts three claims for relief.[4] In their first claim, labeled "Floatage Easement - Public Use Doctrine - Preemption of Municipal Ordinances and Policies"

---

[4] Plaintiffs' complaint is difficult to decipher; it contains repetitive and overlapping allegations and appears to "mix and match" legal theories among the asserted claims and requests for relief, so that the issues were imprecisely framed for the trial court.

(boldface and italics omitted), plaintiffs contend that, because the lake is "navigable-in-fact" and was meandered, Resolution 12-12 is "preempted by the Public Trust and/or Public Use Doctrine," regardless of who owns the underlying lake beds.[5] On that claim for relief, they request in their prayer a judgment

> "declaring that the Lake is navigable-in-fact, and that, regardless of any title interest or other interest that the City, State, LOC, or other persons may have in the soil underlying the Lake, there exists a right of the public of access to the waters of the Lake, and that the waters of the Lake are owned by the State of Oregon and are held in trust for the preservation of the public right of recreation, including paddling, canoeing, boating, and swimming, and other public rights which all citizens enjoy in such waters under common law."

In their second claim, entitled "Public Trust Doctrine - Title Navigability - Preemption of Municipal Ordinances and Policies" (boldface and italics omitted), plaintiffs request a declaration that "the submerged and submersible lands below the ordinary high water mark of the Lake have been and are owned by the State of Oregon and held in trust for the public since the time of statehood"—that is, that the lake is "title navigable"—and that Resolution 12-12 and the swim-park rule are likewise "preempted by the Public Trust Doctrine and/or Public Use Doctrine." On that claim, they ask for a judgment

> "declaring that title to the navigable waters of the Lake as it existed at statehood and its submerged and submersible lands are held by the State of Oregon and impressed in

---

[5] In a footnote in their opening brief, plaintiffs contend that the trial court incorrectly concluded that plaintiffs' first claim for relief challenged only Resolution 12-12 and not the swim-park rule. Not surprisingly, see 285 Or App at 185 n 4, plaintiffs' complaint is ambiguous in that regard. Although they make allegations concerning the swim-park rule, plaintiffs' first claim for relief generally focuses on Resolution 12-12 and plaintiffs' request for a declaration that Resolution 12-12 is preempted by the public-trust doctrine. Thus, we tend to agree with the trial court (and defendants) that the claim did not encompass the swim-park rule. However, because our analysis and conclusion regarding the public-trust doctrine would apply equally to defeat a challenge to the swim-park rule under that doctrine, the disputed scope of the first claim ultimately is of no consequence, and, thus, we need not resolve it.

trust for the preservation of the public right of recreational use and other public rights which all citizens enjoy."

In their third claim for relief, against the city only, plaintiffs contend that the city's adoption and enforcement of Resolution 12-12 and the swim-park rule violate Article I, section 20, of the Oregon Constitution (the "Privileges and Immunities Clause"); they seek a judgment

"declaring that the defendant City, through its adoption, implementation, and enforcement of Resolution 12-12, has violated Or. Const. art, I, § 20, by effectively granting a small class of Oregon citizens monopolistic, privileged access to, and use of, the waters of the Lake that do not belong upon the same terms to all citizens, and declaration that Resolution 12-12 is therefore void."[6]

With respect to all claims for relief, plaintiffs also sought injunctive relief, specifically a judgment enjoining defendants from enforcing Resolution 12-12 and the swim-park rule; from "limiting access from City-owned properties to classes of individuals limited to residents of the City and/or members or guests of LOC and easement association members who enjoy access to the Lake"; and from erecting or maintaining fences, boulders, signs, or other obstacles designed to prevent or discourage the public from exercising its rights to reasonable access to the lake. They further sought to enjoin defendants to "protect and preserve the enjoyment of those rights by the entire public, including the preservation and protection of all rights incident to reasonable public use of the Lake," and "to remove or otherwise be prevented from enforcing any deed restrictions on City-owned properties that interfere with or discourage the public's right of reasonable access to and use of the Lake"

---

[6] Notwithstanding the phrasing of that request, the parties and the trial court understood plaintiffs' Article I, section 20, claim to also apply to the swim-park rule, and we agree. Plaintiffs' original complaint did not assert an Article I, section 20, claim and did not specifically address the swim-park rule. Plaintiffs were granted leave to amend their complaint to include the swim-park rule and to add a challenge under Article I, section 20 *after* the parties had filed motions for summary judgment. Consequently, the briefing and argument on the parties' summary judgment motions essentially occurred in two stages; the first focused on the provisions of Resolution 12-12, the second on whether the swim-park rule violated Article I, section 20. Plaintiffs' original complaint also asserted a claim under 42 USC section 1983, which was dismissed by stipulation.

or from converting or transferring title of any of those properties in a way that would interfere with or frustrate those public rights.[7]

Plaintiffs moved for partial summary judgment on their first claim for relief, arguing that

"there is no material disputed issue of fact that, regardless of title navigability and ownership of the beds of the Lake, the Lake is navigable-in-fact under Oregon law and the public therefore has a right of recreational use of the Lake's waters and a right of public access as a necessary incident of that right. Therefore, plaintiffs are entitled to a declaration that the Lake's waters are held in trust for use and enjoyment by the entire public, and that Resolution 12-12, to the extent it forecloses all public access to the waters of the Lake, is contrary to state law."

Defendants opposed plaintiffs' motion and individually responded with their own cross-motions for summary judgment. Specifically, the city moved for summary judgment on all claims, arguing that Resolution 12-12 is a proper exercise of the city's governmental authority because it is narrowly drawn and "rationally related to the purposes for which the City enacted it." It also contended that neither the public-use doctrine nor the public-trust doctrine (or any other provision of law) requires the city to provide access to the lake "simply because it happens to own property adjacent to water." With respect to the swim-park rule, the city contended that the rule does not violate Article I, section 20, because the city had rational bases for opening the swim park to city residents only, including avoiding the risk of losing ownership of the swim park due to the deed restrictions and preserving limited city resources for the benefit of city taxpayers. It also contended that plaintiffs lacked standing to challenge the swim-park rule because plaintiff Kramer,

---

[7] Plaintiffs also requested, as to all claims for relief, a judgment declaring that,

"because the Lake is navigable for title under federal law and/or navigable-in-fact or otherwise accessible to the public under State law for its reasonable use and enjoyment, and *** the plaintiffs, as members of the public, have a right of recreational use of the waters of the Lake regardless of the ownership of the soil underlying the Lake[,] *** Resolution 12-12, as applied, is incompatible with State law and is preempted."

the noncity resident, did not allege that he would otherwise use the swim park.

The state moved for summary judgment on the two claims that plaintiffs asserted against it (the first and second claims) on the grounds that (1) the claims are not justiciable against the state because plaintiffs do not allege any adverse action against them by the state and do not seek relief against the state, and (2) as a matter of law, the public-use and public-trust doctrines do not include affirmative state obligations or duties.[8]

LOC moved both to dismiss plaintiffs' first and second claims for relief for lack of subject matter jurisdiction under the Uniform Declaratory Judgments Act and for summary judgment on those claims. As to the latter, LOC argued that it was entitled to judgment as a matter of law that the city's Resolution 12-12 was a "valid, enforceable ordinance," and that plaintiffs do not have lawful access to the lake and "that a 'floatage easement' does not apply to [the lake]."

As noted, the trial court ruled in favor of defendants. The court held that the city was authorized under its charter to adopt Resolution 12-12 and that plaintiffs had identified no valid limitation on that authority. The court assumed without deciding both that the state owns the subsurface of the lake and that the waters of the lake are navigable and concluded that there is no basis under either the public-trust doctrine or the public-use doctrine to impose against the city or the state a duty to ensure that plaintiffs and the public have access to the lake. The court reasoned that the state, not the city, is the only trustee that has trust obligations under the public-trust doctrine and, therefore, the doctrine could not, as plaintiffs contended, render the city's action in adopting Resolution 12-12 invalid. And, as to the state, the court could not impose on the state

---

[8] The state argued that a declaration that the state holds title to the waters and submerged and submersible lands of the lake—as asserted in plaintiffs' second claim for relief—is not adverse to the state because Sucker Lake (a predecessor to present-day Oswego Lake) was meandered and the state asserts ownership to the bed and banks of all meandered lakes under ORS 274.430(1), and because the lake was used or susceptible to use for navigation at the time of statehood and, thus, is "title navigable."

an affirmative duty to take action in respect to upland property that it did not own. Nor, the trial court held, could the public-use doctrine provide a basis to challenge the city's actions, because, "[a]lthough the doctrine may allow temporary touching or access to uplands where necessity requires it, the doctrine cannot serve as a basis for preventing upland owners from restricting access to the water." The court also concluded that neither Resolution 12-12 nor the swim-park rule violated Article I, section 20. Accordingly, the trial court granted defendants' motions for summary judgment and denied plaintiffs' motion for partial summary judgment and entered a judgment dismissing plaintiffs' claims with prejudice.[9] Plaintiffs appeal that judgment.

## II. ANALYSIS

Plaintiffs assign error to the denial of their motion for partial summary judgment and the grant of defendants' motions for summary judgment. Both rulings are reviewable. *See, e.g., Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law. *Hamlin v. Wilderville Cemetery Association*, 259 Or App 161, 163, 313 P3d 360 (2013) (citing ORCP 47 C). Here, as explained below, the issues ultimately reduce to legal questions.

Plaintiffs raise three primary arguments on appeal.[10] First, they contend that, under *Chernaik v. Kitzhaber*, 263 Or App 463, 328 P3d 799 (2014), the trial court "erred not to grant declaratory relief in Plaintiffs' favor on the First Claim that the entire Lake is public, regardless of the outcome on

---

[9] Although the court indicated some uncertainty about plaintiffs' standing to challenge Resolution 12-12, as disputed by LOC in its motion to dismiss, the court ultimately denied LOC's motion, and LOC does not cross-assign error to that ruling on appeal. Similarly, the court did not rule on the city's argument regarding plaintiff Kramer's standing to challenge the swim-park rule, and the city does not renew that argument on appeal.

[10] Although plaintiffs assign error to the trial court's grant of summary judgment to defendants generally, they do not raise any argument regarding the trial court's ruling in favor of defendants on plaintiffs' *second* claim for relief—which alleges that, because the lake is navigable for title under federal law, the public-trust doctrine preempts Resolution 12-12 and the swim-park rule.

the remaining issues," that is, that the court erred in denying declaratory relief on that point regardless of whether plaintiffs are entitled to declarations regarding the public's right of access to the lake, the validity of Resolution 12-12, or the related injunctive relief that they requested in their complaint. Second, plaintiffs contend that the court erred because, regardless of the ownership of the lake bed, they are entitled under their first claim for relief to a declaration "that the entire Lake, as a navigable water under state law, is subject to public use" under Oregon's public-trust doctrine. In their view, under that doctrine, the public's "right of navigation necessarily includes the right to cross from the public park to the public water, subject only to reasonable regulations on use," which Resolution 12-12 is not. Finally, plaintiffs contend that the trial court erred in concluding, as to their third claim for relief, that neither Resolution 12-12 nor the swim-park rule violates Article I, section 20. We consider each argument in turn.

## A. *Entitlement to Partial Declaration*

We first address plaintiffs' contention that they were entitled under their first claim for relief to a "partial" declaration that the entire lake is "public" (because it is navigable in fact) regardless of their requests for other declarations regarding the right of access to the lake and related injunctive relief.[11] In their view, the court was required to declare the answer to that predicate factual question (navigability), regardless of its resolution of the ultimate legal questions (regarding defendants' obligations under the public-trust doctrine to ensure access to the lake).

The state responds that, because the trial court correctly decided that neither the state nor the city has an affirmative duty to provide public access to the lake under the public-use or public-trust doctrines, the court's decision properly disposed of the controversy, and the court was not required under the Uniform Declaratory Judgments Act or *Chernaik* to issue a declaration regarding whether the

---

[11] As plaintiffs put it in their reply brief, the fact that plaintiffs "also sought declarations regarding the right of access and related injunctive relief does not nullify the request for a declaration that the Lake is public."

lake is navigable in fact.[12] For its part, LOC contends that plaintiffs did not seek the "limited" and "abstract" declaration that plaintiffs now contend that the trial court failed to issue, but, even if plaintiffs had sought such a declaration, the court properly declined to issue it because it "would not have addressed the core of Plaintiffs' claims—to declare Resolution 12-12 invalid and to enjoin the City and the State to ensure general public access to the Lake." In LOC's view, because there are factual and legal disputes over whether and what portions of the lake are navigable in fact, and over the scope and application of the public-use and public-trust doctrines, the trial court properly exercised its discretion under the Uniform Declaratory Judgments Act to evaluate plaintiffs' claims *by assuming* the applicability of the doctrines.

We conclude that the trial court did not err in taking the approach that it did. First, we tend to agree with LOC that plaintiffs' summary judgment motion did not clearly present to the trial court an asserted entitlement to a partial declaration.[13] In their memorandum of law supporting their motion, plaintiffs described the motion as "request[ing] a declaration that, under their First Claim for Relief, pursuant to Oregon's Public Floatage Easement or Public Use Doctrine, [the lake] is subject to use by the entire public, including plaintiffs, for recreational swimming and paddling, *and defendants [state and city] should be enjoined to enforce those public uses by ensuring a right of access to the [L]ake for the recreating public.*" (Emphasis added.) Read as a whole, the motion sought judgment as a matter of law on plaintiffs' first claim for relief on the theory that Resolution 12-12 was "preempted" by the public-trust doctrine because

---

[12] That question, the state points out, presents disputed issues of fact. It notes that, although the state agrees with plaintiffs that the portion of the lake that was formerly Sucker Lake would qualify as navigable in fact under state law, LOC disputed that assertion and, as with the question of title navigability, that factual dispute precludes summary judgment on whether the lake is navigable in fact.

[13] Indeed, it is unclear whether the complaint itself encompasses a request for such a declaration. Plaintiffs point to the first paragraph of the prayer for relief, but there, too, the request is intertwined with the request for a declaration that "there exists a right of the public of *access* to the waters of the Lake." (Emphasis added.) *See* 285 Or App at 186.

it infringed on the public's asserted right of access to the lake. It was not until their reply and response to defendants' motions for summary judgment that plaintiffs briefly touched on the issue, stating that, even if the court declined to issue injunctive relief, it still should declare that "the waters of the entire Lake are public not private." In short, we are not convinced that plaintiffs properly raised before the trial court the issue of their entitlement to a partial declaration that the lake is public. *See, e.g., Two Two v. Fujitec America, Inc.*, 355 Or 319, 326, 325 P3d 707 (2014) ("Parties seeking summary judgment must raise by motion the issues on which they contend they are entitled to prevail as a matter of law."); *id.* at 325 (issue raised in reply memorandum is not raised in the motion).

But, even assuming that the issue was properly before the trial court, neither the Uniform Declaratory Judgments Act nor *Chernaik* compels the conclusion that plaintiffs were entitled to such a declaration simply because they requested it.

Plaintiffs point to ORS 28.010, which states, in part, "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations, *whether or not further relief is or could be claimed.*" (Emphasis added.) Plaintiffs are thus correct that ORS 28.010 authorizes a court to grant partial declaratory relief. And, in some circumstances, it may be error for a court to refuse to do that. *See, e.g., Pendleton School Dist. v. State of Oregon*, 345 Or 596, 610-11, 200 P3d 133 (2009) (trial court should have granted partial summary judgment to plaintiffs as to one part of their declaratory judgment claim, although plaintiffs were not entitled, on the merits, to another declaration or the injunctive relief they sought); *see also Brown v. Oregon State Bar*, 293 Or 446, 451, 648 P2d 1289 (1982) (trial court erred in refusing to issue declaration concerning plaintiff Attorney General's statutory duties, although another declaration sought by plaintiff did not present a justiciable controversy).

However, contrary to plaintiffs' contentions, neither the statute nor the cited cases stand for the proposition that a trial court is *required* to issue a declaration in the

circumstances here—that is, where the controversy between the parties can be resolved *without* issuing such a partial declaration. Indeed, ORS 28.060 contemplates some discretion on the part of a trial court in deciding whether to issue a declaration. It provides, "The court may refuse to render or enter a declaratory judgment where such judgment, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding." *See also* ORS 28.050 (stating that statutory enumeration of circumstances in which court may issue declaratory judgment "does not limit or restrict the exercise of the general powers conferred in ORS 28.010, in any proceedings where declaratory relief is sought, in which a judgment will terminate the controversy or remove an uncertainty").

Here, a declaration only as to whether the lake is navigable "would not terminate the uncertainty or controversy giving rise to the proceeding"—that is, it would not resolve whether Resolution 12-12 therefore is "preempted" by state law or otherwise invalid. And, on the other hand, the trial court was able to resolve the controversy without making the declaration, because, *even assuming* that the lake was navigable and the public-use and public-trust doctrines applied, neither would invalidate the city's actions or otherwise impose on the city or the state an obligation to provide plaintiffs with recreational access to the lake, as plaintiffs' complaint alleged. Thus, there were countervailing reasons not to enter the declaration. *See Brown*, 293 Or at 451 (considering discretion provided under ORS 28.060 and concluding that, "where a justiciable controversy exists and the trial court has jurisdiction over the subject matter of the controversy, the court should afford relief *absent valid countervailing reasons*" (emphasis added)). In other words, because neither the public-use nor public-trust doctrine operated to require the city or the state to provide public access to the lake for recreational purposes—thereby "preempting" Resolution 12-12 as plaintiffs contended—it was not necessary for the court to declare whether the lake was navigable in fact and therefore "public" in order to resolve the controversy. In those circumstances, the court was not required to issue the declaration requested. *Cf. Dental v. City of Salem*, 196 Or App 574, 582, 103 P3d 1150 (2004) (trial

court erred in awarding declaratory relief where, among other valid countervailing reasons, the legislature had created a special statutory remedy that would provide more effective relief and "nothing in the record indicates that the declaratory relief at issue would serve a useful purpose").

*Chernaik*, which was decided after the trial court issued its decision in this case, is not to the contrary. There, the plaintiffs brought suit against the Governor and the State of Oregon, seeking declaratory and injunctive relief. The plaintiffs' first two requests for declaratory relief sought declarations that "the atmosphere," as well as "water resources, navigable waters, submerged and submersible lands, islands, shorelands, coastal areas, wildlife and fish" are public-trust resources, and that the state, as trustee, has fiduciary obligations to protect those "commonly shared public trust resources from the impacts of climate change." 263 Or App at 468. The trial court granted the defendants' motion to dismiss the complaint for lack of subject matter jurisdiction. *Id.* at 471.

We reversed, explaining, first, that the authority of the court to issue a declaration under the Uniform Declaratory Judgments Act is not, as the trial court may have understood, limited to a declaration of rights or legal relations based on a written constitution or statute, but, rather, can be based on other sources of law. *Id.* at 474. We also disagreed with the trial court that the requests for the bare declarations—without injunctive relief—were nonjusticiable because the declarations "would not explicitly require defendants to do anything" and, therefore, would not afford the plaintiffs "the sort of 'meaningful relief' that makes a claim justiciable." *Id.* at 475, 476 (quoting *Hale v. State of Oregon*, 259 Or App 379, 384, 314 P3d 345 (2013), *rev den*, 354 Or 840 (2014)). We concluded that such a theory could not survive *Pendleton School Dist*, in part, because "courts and the public are entitled to assume that the state will act in accordance with its duties as those duties are announced by the courts." *Chernaik*, 263 Or App at 478. Thus, we held that the plaintiffs' requests *were justiciable,* and the trial court had consequently erred in not entering the requested declarations—that is, declarations as to *whether* the identified resources were trust resources obligating the state to

certain fiduciary duties under the public-trust doctrine. *Id.* at 478-79. We also emphasized that the defendants' motion to dismiss was explicitly *not* directed to the merits of the plaintiffs' allegations regarding the scope of the public-trust doctrine or the defendants' obligations under it. *Id.* at 469, 480.

This case, however, differs from *Chernaik* in two significant, and ultimately dispositive, respects. First, unlike in *Chernaik*, here, the court explicitly resolved the merits of plaintiffs' allegations regarding the scope of the public-trust doctrine and defendants' obligations under it with respect to the lake, as asserted in plaintiffs' claim for relief—concluding that it could do so without reaching the predicate, factual determination regarding navigability because, even if it resolved that factual question in plaintiffs' favor, plaintiffs would not be entitled to the relief that they sought. Second, in this case, the issue is not whether the request for a declaration was within the court's power to determine (that is, whether it was justiciable), but whether the trial court could properly choose *not* to issue a particular declaration, because doing so would not, in any event, "terminate the uncertainty or controversy giving rise to the proceeding." ORS 28.060. For those reasons, *Chernaik* is not controlling.

In sum, we conclude that plaintiffs were not entitled, in the abstract, to a declaration as to the public nature of the lake. If the trial court was correct in its understanding of the operation of the public-trust doctrine as related to plaintiffs' claim for relief—and, as explained below, we agree that it was—the trial court did not err in failing to declare whether the entire lake is "public."[14]

## B. *Application of Public-Trust Doctrine*

Plaintiffs acknowledge that the summary judgment record contains conflicting evidence as to the ownership of the lake bed—that is, ownership of the submerged and submersible lands underlying the lake. However, plaintiffs (and

---

[14] However, as we later explain, the court did err in dismissing plaintiffs' claims rather than entering a declaration of the parties' rights. *See Doe v. Medford School Dist. 549C*, 232 Or App 38, 46, 221 P3d 787 (2009).

*amici curiae* law professors and Willamette Riverkeeper[15])
contend that the public-trust doctrine protects the public's
right to use navigable water bodies—and requires the state
and the city to ensure that the public is able to exercise that
right—*regardless of title to the beds*, and, therefore, that the
trial court erred in denying plaintiffs' motion for partial
summary judgment and granting defendants' motions on
plaintiffs' first claim for relief.

.In plaintiffs' view, the public-trust doctrine "allows
each state to decide for itself how to determine whether a
waterway is public" and, therefore, subject to protection
under the public-trust doctrine, and Oregon has done that
with respect to all navigable "in fact" waterways, includ-
ing Oswego Lake. As support for that proposition, plaintiffs
point to (1) a provision of the Oregon Admission Act, which
provides that "all the navigable waters of [the] State, shall
be common highways and forever free," Act of Feb 14, 1859,
ch 33, § 2, 11 Stat 383; (2) the common-law "public use," or
"floatage easement" principles set out in *Weise v. Smith*, 3
Or 445 (1869), *Guilliams v. Beaver Lake Club*, 90 Or 13, 175
P 437 (1918), and *Luscher v. Reynolds*, 153 Or 625, 56 P2d
1158 (1936); and (3) ORS 274.430(1), which states, in part,
"All meandered lakes are declared to be navigable and pub-
lic waters. The waters thereof are declared to be of public
character."

According to plaintiffs, because Sucker Lake (as
mentioned, the former name for a portion of what is now
Oswego Lake) has been "meandered," there can be no fac-
tual dispute that all of the present day lake is "navigable
and public."[16] Consequently, plaintiffs posit, under *Weise*,
*Guilliams*, and *Luscher*, the public-trust doctrine guaran-
tees the public's access to the lake from the adjacent uplands,
"subject only to reasonable use restrictions," and the city's
restrictions here are not reasonable. Plaintiffs contend
that the trial court erred in deciding otherwise, because

---

[15] For convenience, we subsequently refer to them simply as "*amici* law
professors."

[16] According to plaintiffs, the fact that the boundaries of Sucker Lake have
expanded because of artificial improvements does not alter that determination.
Alternatively, plaintiffs request a remand for the trial court to determine the
factual question of navigability.

it erroneously relied on cases involving access to the water from private, rather than public, uplands. Plaintiffs acknowledge that Oregon courts have not addressed a municipality's obligation under the public-trust doctrine, but they contend, nonetheless, that Resolution 12-12 is inconsistent with, and therefore preempted by, the doctrine because it "unreasonably monopolize[s] use of the lake and subject[s] it to private interest." (Capitalization altered.)

Defendants respond that the public-trust doctrine applies only with respect to "title-navigable" waterways, that is, waterways to which the state was granted ownership of the underlying land as an incident of sovereignty under the equal-footing doctrine.[17] They contend that plaintiffs are attempting to expand the doctrine to apply to waters that have not been determined to be title navigable under federal law by conflating the public-trust doctrine with the separate concept of "public use" or "floatage easement," as described in *Weise, Guilliams,* and *Luscher.* In their view, the doctrines are separate and distinct under Oregon law, and plaintiffs' contrary position is not supported by Oregon law.[18]

---

[17] Under that doctrine,

"Oregon 'gain[ed] title within its borders to the beds of waters then navigable' when it became a state in 1859. *PPL Montana, LLC v. Montana,* 565 US [576, 590-91], 132 S Ct 1215, 1227-28, 182 L Ed 2d 77 (2012) (*PPL Montana*). And, the state is entitled to 'allocate and govern those lands according to state law subject only to "the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce."' *Id.* (quoting *United States v. Oregon,* 295 US 1, 14, 55 S Ct 610, 79 L Ed 1267 (1935)). Thus, generally, '[l]ands lying below the ordinary high water mark of navigable rivers are * * * owned by the state and are considered to have been so held since the admission of that state to the Union.' *Northwest Steelheaders Association v. Simantel,* 199 Or App 471, 480, 112 P3d 383, *rev den,* 339 Or 407 (2005), *cert den,* 547 US 1003 (2006) (footnote omitted)."

*Hardy v. Land Board,* 274 Or App 262, 265-66, 360 P3d 647 (2015), *rev den,* 358 Or 550, *cert den,* ___ US ___, 137 S Ct 370, 196 L Ed 2d 290 (2016) (omission and first and third brackets in *Hardy*; footnote omitted).

[18] The city also contends that we should not consider plaintiffs' theory that conflates the public-use and public-trust doctrines because it is being made for the first time on appeal, noting that plaintiffs affirmatively pleaded them as two separate claims in their complaint—that is, their first claim was under the "Floatage Easement - Public Use Doctrine" and their second claim was a "Public Trust Doctrine - Title Navigability" claim. Although, as previously noted, plaintiffs' amorphous complaint makes the task difficult, we conclude that the first claim for relief can be understood to encompass, if marginally, the theory plaintiffs argue on appeal—essentially that, if waters are navigable in fact, they are subject to the public-trust doctrine.

However, defendants also argue that, even if plaintiffs are correct that the public-trust doctrine applies to all navigable-in-fact waterways (by incorporating public-use principles), defendants nonetheless are still entitled to summary judgment. From the state's point of view, that is so because "*neither doctrine imposes a duty on the state to provide public access to a waterway across bordering uplands that are not owned by the state.*" (Emphasis added.) The city agrees, arguing that the public-use doctrine has no relevance to the city's park policies because the doctrine "creates a floatage easement on the water itself—it does not create any easement across upland to *reach* the water." (Emphasis in original.) And, according to the city and the state, plaintiffs' attempted distinction between "public" and "private" upland ownership to reach a different conclusion is groundless. The city further argues that, even if the state has some obligation under the public-trust doctrine to ensure upland access (a proposition that, as just noted, the state disputes), that obligation would not extend to the city, because, as the trial court correctly determined, the city is not an instrumentality of the state or acting as an agent of the state in operating its city parks.

LOC concurs with the state and the city that neither doctrine creates or implies a right of access to navigable waters from upland properties, nor do those doctrines "eviscerate riparian rights and authorize a trespass."[19] It points out that the public-use doctrine is "confined to public use of the water, with a limited right of bank use *from* the water, as incidental and necessary to navigation." (Emphasis in original.)

As explained below, we agree with defendants that, even if the public-trust doctrine applies to all navigable waterways regardless of ownership of the underlying land—a

---

[19] *Amicus curiae* Pacific Legal Foundation argues, in support of LOC, that, "because the [public-trust] doctrine concerns the ownership and management of certain submerged lands and the waters above them, all rights and obligations relating thereto 'end at the water's edge.'" (Quoting *Lebanon Lumber Co*, 68 Or at 150.) It maintains that Oregon's common law of shoreline property ownership "holds that, absent a showing that the use of upland property is temporary, minimally invasive, and necessary for the water-based use, the public has 'no common-law right to use the land adjoining a river above high-water mark.'" (Quoting *id.*)

question that we need not decide[20]—it does not obligate the state or the city to provide public access to the lake from the upland city parks. In other words, assuming without deciding (1) that the lake is "public" under state law, and (2) that the public-trust doctrine applies to the lake (regardless of

---

[20] That is, we need not parse whether the concept of "pubic use" as articulated in some early Oregon decisions is a separate legal theory or, as plaintiffs argue, simply reflects Oregon's decision to include within the scope of the public-trust doctrine all navigable waterways, regardless of title to the underlying beds. However, we make two comments regarding that issue.

First, *PPL Montana* suggests that the public-trust doctrine is not necessarily limited to title-navigable waterways. In rejecting the State of Montana's argument in that case that denying it title navigability to the riverbeds at issue would "undermine the public trust doctrine, which concerns public access to the waters above those beds for purposes of navigation, fishing, and other recreational uses," the Court observed that the state had "misapprehend[ded]" the equal-footing and public-trust doctrines. 565 US at 603. The Court noted that, "[u]nlike the equal footing doctrine * * *, which is the constitutional foundation for the navigability rule of riverbed *title*, the public trust doctrine remains a matter of state law." *Id.* (emphasis added); *see also id.* at 604 ("Under accepted principles of federalism, the States retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed *title* under the equal-footing doctrine." (Emphasis added.)).

However—and this is our second point—in Oregon, the Oregon Supreme Court has described Oregon's waterways as being divided into "several *distinct* classes":

"(1) Those in which the tide ebbs and flows, which are technically denominated navigable, in which class the sovereign is the owner of the soil constituting the bed of the stream, and all right to it belongs exclusively to the public. (2) Those which are navigable in fact for boats, vessels, or lighters. In these the public has an easement for the purposes of navigation and commerce, they being deemed public highways for such purposes, although the title to the soil constituting their bed remains in the adjacent owner, subject to the superior right of the public to use the water for the purposes of transportation and trade. (3) The streams which are so small and shallow that they are not navigable for any purpose, the public has no right to whatever. (4) To this list may be added our larger rivers susceptible of a great volume of commerce where the title to the bed of the stream remains in the state for the benefit of the public."

*Guilliams*, 90 Or at 19 (emphases added). That description could be read to suggest that, under Oregon law, the public's interest in navigable waterways differs depending on ownership of the underlying land—that is, that the concept of title being held by the state in trust for the public applies only to title-navigable waterways, and the public's interest in other navigable waterways is treated more like an easement. *See also Luscher*, 153 Or at 634-36 (holding that, although not title navigable, the lake was navigable "in a qualified or limited sense," as described in *Guilliams*'s second classification, and, thus, "[r]egardless of the ownership of the bed, the public has the paramount right to the use of the waters of the lake for the purpose of transportation and commerce"). Whether that distinction makes a difference is not a question that we need to decide here, because we conclude that plaintiffs are not, in any event, entitled to the relief that they seek.

state ownership of the submerged and submersible lands), we conclude that the doctrine does not require defendants to "provide reasonable access [across the upland city parks] for the public to use and enjoy the Lake waters," as plaintiffs contend in their complaint. Thus, the trial court did not err in denying plaintiffs' motion and granting summary judgment to defendants on plaintiffs' first claim for relief.

It is helpful to begin with some basic vocabulary. The phrase "submersible lands" generally refers to the land lying between the high-water mark and the low-water mark of a navigable body of water, whether tidal or nontidal; the term "submerged lands" is used to describe the land lying below the low-water mark. *See* ORS 274.005(8), (7). And, the land lying above the high-water mark is commonly called the "upland." *See Smith Tug v. Columbia-Pac. Towing*, 250 Or 612, 614, 443 P2d 205 (1968) (so observing).

The public-trust doctrine *per se*—that is, as it has been applied to title-navigable waterways—provides that the state, by virtue of its sovereignty and its admission as a state under the equal-footing doctrine, takes title to the submerged and submersible lands underlying navigable waters *in trust for the public* for purposes of navigation, fishing, and recreation. *Shively v. Bowlby*, 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894); *Illinois Cent. R. Co. v. State of Illinois*, 146 US 387, 452, 13 S Ct 110, 36 L Ed 1018 (1892) ("It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties."); *Morse v. Division of State Lands*, 34 Or App 853, 860, 581 P2d 520 (1978), *aff'd on other grounds*, 285 Or 197, 590 P2d 709 (1979) (recognizing recreation as a use protected by the doctrine); *see also Cook v. Dabney*, 70 Or 529, 532, 139 P 721 (1914) ("[U]pon the admission of the state into the Union it was vested with the title to the lands under navigable waters, subject, however, at all times to the rights of navigation and fishery.").

In defendants' view, the doctrine operates as a *restraint* on the state's power to alienate or otherwise encumber lands underlying navigable waterways in a manner that might substantially impair the public's interest in the

waterway—as the state is otherwise free to do with respect to other land that it owns—it does not *oblige* the state to take affirmative action to create or ensure that the public has access to those waterways from adjoining uplands. We generally agree with that understanding.

The United States Supreme Court's decision in *Illinois Cent. R. Co.* is illustrative. In that case, the Court held that the Illinois legislature could not cede the state's ownership and control in and over certain submerged lands in Lake Michigan—to which the state held title under federal title-navigability principles—to a private railroad corporation under circumstances where the railroad could impede navigation on the state's waters. 146 US at 460-61. The Court explained that the state's title to the submerged land "is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id.* at 452. Title is held by the state by virtue of its sovereignty, and is "different in character from that which the state holds in lands intended for sale."[21] *Id.* Thus, the state cannot abdicate its trust duties in such property by disposing of parcels of it to private parties, except for the purpose of "improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains."[22] *Id.* at 453. In other words, the state could not grant title to submerged and submersible lands where "abdication is not consistent with the exercise of that trust[,] which requires the government of the state to preserve such waters for the use of the public." *Id.* at 452. As the Court later observed in *Shively,*

"it was recognized [in *Illinois Cent. R. Co.*] as the settled law of this country that the ownership of, and dominion

---

[21] There are two aspects to the state's ownership of such lands. The first, called the *jus privatum*, is fee simple title. The second, the *jus publicum*, is dominion, which the state holds in trust for the public. *See Bowlby v. Shively*, 22 Or 410, 418-19, 30 P 154 (1892), *aff'd*, 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894).

[22] Thus, the state's *jus privatum* interests may be sold "so as to convey private interests therein; * * * the phrase, by virtue of its sovereignty, was not intended to preclude any private use by the state's grantee which did not interfere with the public rights." *Bowlby,* 22 Or at 418.

and sovereignty over, lands covered by tide waters, or navigable lakes, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in such waters, and subject to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce."

152 US at 47.

Oregon courts considering the public-trust doctrine *per se* have also focused on the extent to which the state can alienate the lands held in trust, or on the power of the state to regulate activity with respect to those title-navigable waterways. In its own opinion in *Bowlby v. Shively*, 22 Or 410, 427, 30 P 154 (1892), *aff'd*, 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894), the Oregon Supreme Court held:

> "[O]ur courts have declared [the state's] absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, unaffected by any 'legal obligation to recognize the rights of either the riparian owners, or those who had occupied such tide lands,' other than it chose to resign them, subject only to the paramount right of navigation and the uses of commerce."

Later, in *Corvallis & Eastern R. Co.*, 61 Or 359, 370, 372, 121 P 418 (1912), the court upheld under the public-trust doctrine a grant of private rights in certain tidelands, observing that its opinion in *Bowlby* was "[t]he controlling precedent in this State" and rejecting the defendants' argument that "the title that the State holds to its tidelands is incident to and a part of its sovereignty which cannot be surrendered or alienated, except for some public purpose, or any reasonable use for the public benefit."

In *Cook*, on the other hand, the court held that the public-trust doctrine voided the state's conveyance of a portion of the bed of the Willamette River; the portion conveyed was "directly in the official route of navigation," 70 Or at 532, and, the court held, under *Illinois Cent. R. Co.*, that the state could not sell or dispose of the land underlying its navigable waters so as to prevent the use by the public of those waters for navigation:

"It is true that upon the admission of the state into the Union it was vested with the title to the lands under navigable waters, subject, however, at all times to the rights of navigation and fishery. To all intents and purposes the title of the state was burdened with a trust, so to speak, in favor of those two occupations. It would have no right or authority so to dispose of the subjacent lands in a manner calculated to prejudice or impede the exercise of those rights. *It was never intended by any of the legislation concerning the alienation of state lands that the state should sell the beds of the navigable streams in a way to interfere with their navigability.*"

*Id.* (emphasis added).

More recently, the Oregon Supreme Court held in *Morse v. Oregon Division of State Lands*, 285 Or 197, 199-200, 207, 590 P2d 709 (1979), that the public-trust doctrine did not prohibit the Division of State Lands from issuing a permit to the City of North Bend to fill 32 acres of Coos Bay for an airport extension—a non-water-related use that, it was found, would reduce the water surface area of the estuary, displace some marine life, and eliminate some casual recreational navigation. Relying on *Illinois Cent. R. Co.* and *Shively*, the court concluded that nothing about the public-trust doctrine limited fills to water-related uses, explaining that "[t]here is no grant here to a private party which results in such substantial impairment of the public's interest as would be beyond the power of the legislature to authorize." *Id.* at 203.[23]

Thus, although we understand the concept of public trust to protect the public's right *to use* navigable waters— the state cannot, for example, sell all of the underlying lands or permit others to conduct operations on those lands that would substantially impair the public's right to navigate a waterway (including for recreation)—the cases do not

---

[23] *See also Lewis v. City of Portland*, 25 Or 133, 35 P 256 (1893). There, the issue was whether the city could appropriate to public use a strip of land for a bridge abutment on the Willamette River without paying any compensation to the plaintiff landowners. In answering that question in the negative, the court concluded that the plaintiffs had a right to erect and maintain a wharf extending to the navigable water of the river, concluding, "[T]he right of a riparian owner to build a wharf over the submerged soil of a river to navigable water is not inconsistent with the public interest, nor in prejudice of the public rights." *Id.* at 168.

suggest that the doctrine also carries with it an obligation to ensure access to the waterway over adjoining uplands that are *not* likewise held in trust by the state for that use. Essentially, it is the submerged and submersible lands (and the navigable water) that are held in trust for the public under the doctrine, not the adjacent uplands.[24]

Plaintiffs see it differently. As we understand it, their primary argument is that, under Oregon law—specifically, the "public use" line of cases—the public-trust doctrine *does* apply to *certain* uplands—essentially, that the doctrine somehow preempts the ownership rights of the upland owner, *if* that owner is a public entity. As authority for that point plaintiffs rely, in part, on *Weise.*

In *Weise*, decided in 1869, the question was whether the defendant had a right to float saw logs down the Tualatin River, which included temporarily attaching a boom to a small island in the river that was owned by the plaintiff. 3 Or at 446-47.[25] The court held that fastening a boom to the plaintiff's land would otherwise have been a trespass, but, "if the act was necessary in order to enable the [defendant] to exercise a right of navigation, no cause of action would lie for a bare intrusion." *Id.* at 451. Whether the necessity existed and what was a reasonable time for the removal of the boom were questions of fact for the jury. *Id.* In reaching its conclusion, the court, observing that the public has an "absolute right" to navigate the stream, *id.* at 450, stated, "If the riparian proprietor could deny the navigator the right to come to land, in a case where the business of navigating could not be performed, without the privilege of landing, he could deny all use of the stream." *Id.*

Emphasizing the quoted statement here, plaintiffs contend that they therefore have an "'absolute right'" to use the city's public parks to gain access to the lake—one that defendants state and city must take affirmative action to

[24] Thus, an attempt to eliminate all public use of the submerged and submersible lands of a navigable lake—for example, by prohibiting the public from wading anywhere on the bed and banks to fish—would likely violate the public-trust doctrine.

[25] The plaintiff in *Weise* conceded that the river was in fact navigable "to some extent, or for some purposes." 3 Or at 448.

ensure—because it is necessary to enable plaintiffs to exercise their right of recreation on the lake. They argue, "Just as the public in *Weise* could use the private bank to navigate a river, Plaintiffs possess the 'absolute right' to use the public banks of the City's public parks because 'the act [i]s necessary in order to enable the Plaintiff to exercise a right of navigation.'" (Brackets in plaintiffs' brief; emphasis omitted.)

We do not read *Weise* so expansively.[26] The court in *Weise* made clear that the public's right to "meddle with" the private bank of the stream to exercise its right of navigation was both temporary and incidental. *Id.* at 450-51. Here, the right asserted by plaintiffs is significantly more than a temporary and incidental use of the upland property; indeed, the upshot of plaintiffs' claim is that plaintiffs are entitled, under public-trust principles, to continual and permanent use of the city's parks to obtain access to the lake.

*Weise* is not authority—and there is no such authority—for the proposition that the public-trust (or public-use) doctrine imposes an obligation on an upland landowner to allow people to cross the owner's land to gain access to a navigable waterway. In other words, upland land is not impressed with a public easement for access to the waterway. *Weise* established only that upland land *is* impressed with an easement that allows someone using the waterway for navigation to affix a boom *from the water* to the upland to make navigation possible. That was the extent of the easement over the upland that the navigable nature of the waterway implied, which is equivalent to other easements implied to touch the land from the water (*e.g.*, danger, reclamation of property) that operate to prevent the upland contact from being considered a trespass. The upshot of plaintiffs' position to the contrary is that *all* upland—whether publicly or privately owned—would be subject to an access easement if the waterway could not be reached by the public except

---

[26] Nor does *Luscher* assist plaintiffs. The court there held that, because the lake was navigable in fact, under *Guilliams*'s second classification, see 285 Or App at 200 n 20, the public had a right to "use of the waters of the lake for the purpose of transportation and commerce." 153 Or at 636. However, the court did *not* hold that that right, which the court in *Guilliams* likened to an easement, also encompassed an easement *over* the adjoining uplands as necessary to gain access to the lake.

by crossing the upland. That is an untenable proposition in light of existing legal principles.

Moreover, subsequent cases confirm our understanding of the doctrine. In *Lebanon Lumber Co. v. Leonard*, 68 Or 147, 136 P 891 (1913), on which the trial court relied in resolving this question in defendants' favor, the issue was whether the plaintiff had a right to float saw logs down McDowell Creek to the Santiam River. In concluding that the creek was not navigable for saw logs, the court stated:

> "Where the bed and banks of the stream are owned by the riparian proprieter, the navigability of the stream does not give to the navigator a right of way on the land. That can be acquired only by the exercise of the right of eminent domain. In case of the navigation of such a stream, the navigator may find it necessary at times to enter upon the land of a riparian owner by reason of danger, or to reclaim stranded property which was washed ashore without the fault of the owner, but he must pay all damages occasioned thereby; otherwise he is limited to the stream."[27]

68 Or at 150; *see also id.* at 151 ("The right to use a stream for floating does not include the use of it for storage from one freshet to another or during the summer months."); *Guilliams*, 90 Or at 30 (remarking that, although the plaintiffs had a right to navigate a portion of the stream at issue, "[n]either have the plaintiffs any right to land *at any point* on defendant's land without permission" (emphasis added)); *Haines v. Hall*, 17 Or 165, 172, 20 P 831 (1889) (in concluding that creek was not navigable, court reasoned that, even if the appellant had a right to use the waters of a creek running through the respondent's land to navigate his logs, "he had no right to station his men along its banks to float the logs, or allow the logs to go onto the respondent's land or injure the banks of the creek, or turn the stream out of its banks onto the land").

Plaintiffs contend that this case is distinguishable from *Lebanon Lumber Co.* because the upland property

---

[27] The court observed, "'The right of navigation ceases * * * at the water's edge. * * * The public have, therefore, as against the riparian owners, and as incident to the right of navigation, no common-law right to use the land adjoining a river above high-water mark.'" *Lebanon Lumber Co.*, 68 Or at 150 (quoting *Gould on Waters*, § 99 (omissions in *Lebanon Lumber Co.*)).

across which they seek access is public—that is, city owned— rather than private, as it was in that case. They cite a single Oregon case for that proposed distinction, *Darling v. Christensen*, 166 Or 17, 109 P2d 585 (1941), which, they contend, stands for the proposition that "[p]ublic streets or parks bordering public waterways carry with them the right of the public to enter the water." Again, we disagree.

In *Darling*, the court held that, in a dedication in a plat for a residential development abutting the shore of a lake, an attempt to reserve the use of a park and streets to lot owners was ineffective because it was inconsistent with the purpose of such a dedication:

> "[T]he attempted reservation in the foregoing dedication of the park and the streets to the use of the lot owners and not the public, is so inconsistent with the purposes of a dedication of platted property for the purpose of sale as town lots upon the shore of a navigable lake, that it is ineffective and void[.]"

166 Or at 32.[28] Consequently, "such litoral rights to access to the lake by going upon and over the shore in front of the termini of said streets is in the public." *Id.*

*Darling* thus establishes the principle that, in the dedication of streets and parks to the public in property platted for development, an attempt to limit the use of those streets and parks to only the adjacent lot owners (thereby excluding the public) is ineffective and void. It does not stand for the broad proposition, advanced by plaintiffs, that, as long as the uplands bordering a navigable waterway are publicly owned, the public has a right—intrinsic to the right of navigation under the public-trust doctrine—to use those uplands to reach the waterway.[29] In other words, *Darling* does not suggest that the city must be treated

---

[28] *See also Sunset Lake Water Serv. Dist. v. Remington*, 45 Or App 973, 981-82, 609 P2d 896 (1980) (noting that, in *Darling*, "the dedicator attempted to dedicate a public street which could be used only by adjoining landowners, not the public").

[29] Imagine, for instance, that the city owned title to land adjacent to a small yet navigable lake, and the city chose to use that land for a water-treatment plant. We can conceive of no legal principle that would require the city, regardless of that choice, to nonetheless allow the public to cross its land to gain access to the lake.

differently than a private owner of uplands bordering a navigable waterway; just because the city has acquired uplands bordering a navigable lake, it does not follow that the city holds those *uplands* subject to the public's right to use the *waterway.*

Moreover, even if such a right existed, it could conceivably extend only to state-owned uplands, because the state is the trustee of property under the public-trust doctrine. *See, e.g., Morse,* 34 Or App at 860 ("Because the trust is for the public benefit, *the state's trustee obligation* is commonly described as the protection of specified public usages, *e.g.,* navigation, fishery and, in more recent cases, recreation." (Emphasis added.)). Plaintiffs have not identified, nor are we aware of, any controlling authority for their proposition that, "as a subdivision of the State[, the city] shares in public trust responsibilities." The city is not an "instrumentality" or agent of the state for that purpose.[30]

Plaintiffs contend that cases from other states support their position; in particular, plaintiffs (and *amici* law professors) rely on *Public Lands Access Ass'n v. Board of County Com'rs. of Madison County,* 373 Mont 277, 321 P3d 38 (Mont 2014) (*PLAA*). Cases from other jurisdictions are of limited use because, as plaintiffs also recognize, the scope of the public-trust doctrine is a matter of individual state law. Moreover, *PLAA* does not assist plaintiffs in any event. In *PLAA,* the Montana Supreme Court held that the lower court did not err, nor did it effectuate a taking, when it ruled that the public had access to the Ruby River (whose riverbed was privately owned), *via a right-of-way purchased by a county. Id.* at 297, 321 P3d at 50. The riverbed owner's predecessor had deeded a 60-foot-wide right-of-way, including a bridge over the river, as a county road (Lewis Lane), expressly stating that the land was to be used as a public highway. *Id.* at 298, 321 P3d at 51. The court concluded that the deed also granted the swath of riverbed underlying the bridge and within the right-of-way, thus, the public was entitled to use that "bought-and-paid-for right-of-way" to gain access to and to enter the river. *Id.* at 299, 321 P3d at 51.

---

[30] Thus, we need not determine, for purposes of this case, whether a different result would obtain if the uplands were owned by the state rather than the city.

Next, the court held that, even if the deed had not expressly granted a right-of-way to the county for use by the public, allowing the public to use the riverbed up to the high water mark—that is, the bed and banks—did not amount to an unconstitutional taking of the riverbed owner's property, because "it is settled law in Montana that the public may use the *beds of non-navigable rivers, up to the high water mark,* for recreation," even though title did not pass with the right to use the beds. *Id.* at 299, 321 P3d at 51 (emphasis added). Therefore, the court held, because the landowner "never owned a property right that allowed him to exclude the public from using its water resource, *including the riverbed and banks up to the high water mark*[, n]othing has been taken from him." *Id.* at 302, 321 P3d at 53 (emphasis added). Thus, the case simply does not address the issue presented in this case—whether the public is entitled to gain access to a navigable water body across *upland* property.

*Amici* law professors also urge us to adopt Oregon's "doctrine of public beach access" to recognize the public's right to use upland properties to reach navigable waterways, arguing that that doctrine "is best conceptualized as a subset of the public trust doctrine." We note that that theory does not appear to have been raised by plaintiffs before the trial court, nor did they argue it in their briefs to us. *See Finney v. Bransom,* 326 Or 472, 481 n 8, 953 P2d 377 (1998) (declining to consider *amicus* argument that trial court erred in granting summary judgment on theory not presented to the trial court below). However, we readily reject it in any event.

First, Oregon's "doctrine of public beach access," which, in the case of *State ex rel Thornton v. Hay,* 254 Or 584, 462 P2d 671 (1969), established the public's right to use the dry-sand portion of privately owned beachfront property for recreational purposes, was based explicitly on the English doctrine of custom, not on public-trust principles. Indeed, the Oregon Supreme Court ruled that "[t]he custom of the people of Oregon to use the dry-sand area of the beaches for public recreational purposes meets every one of *Blackstone*'s requisites" for application of that doctrine. *Id.*

at 597.[31] And, it appears that the court consciously rejected the public-trust theory as a basis for its decision. *See id.* at 600-01 (Denecke, J., specially concurring) (concurring with the result, but suggesting that it should have been grounded in the public-trust doctrine, citing, *inter alia, Luscher,* 153 Or 625, *Corvallis Sand & Gravel v. Land Board,* 250 Or 319, 335-37, 439 P2d 575 (1968), and *Smith Tug,* 250 Or at 638). Given that history, we fail to see how the doctrine of public beach access can reasonably be understood as a "subset of the public trust doctrine."

Second, to the extent *amici* argue that we should apply the doctrine of custom (which, as just discussed, *is* the basis for Oregon's beach-access law) to recognize the public's right to use the city's adjacent upland parks to obtain access to the lake here, they do not explain how any, let alone, all, of the requisites for that doctrine are satisfied in this case. And we do not see how they could be.[32]

In sum, the upshot of the public-trust doctrine, for purposes of this case, is that the state cannot use its ownership of submerged and submersible lands to interfere with

---

[31] Those requisites are as follows:

"(1) The land has been used in this manner so long 'that the memory of man runneth not to the contrary';

"(2) without interruption;

"(3) peaceably;

"(4) the public use has been appropriate to the land and the usages of the community;

"(5) the boundary is certain;

"(6) the custom is obligatory, *i.e.,* it is not left up to individual landowners as to whether they will recognize the public's right to access; and

"(7) the custom is not repugnant or inconsistent with other customs or laws."

*Stevens v. City of Cannon Beach,* 317 Or 131, 139-40, 854 P2d 449 (1993), *cert den,* 510 US 1207 (1994) (paraphrasing *Hay,* 254 Or at 595-97 (quoting 1 *William Blackstone Commentaries* 76-78 (1778)).

[32] *McDonald v. Halvorson,* 308 Or 340, 780 P2d 714 (1989), supports our conclusion. There, the state intervened to assert, under *Hay,* a public right to use a narrow beach at Little Whale Cove on the Oregon coast, and to enjoin the landowners of Little Whale Cove from interfering with that public right. The Supreme Court held that *Hay* did not apply because the beach did not abut the ocean—in other words, it abutted private land—and there was no record showing a customary use of the beach. *Id.* at 359-60. As the court stated, *Hay* did not "establish[] beyond dispute a public claim by virtue of 'custom' to the right to recreational use of the entire Oregon coast." *Id.* at 359.

the use of navigable waters for transportation, fishing, or recreation—that is, the uses for which the submerged and submersible land (and navigable water) is held in trust by the state for people *who obtain lawful access to the water.* Stated another way, the doctrine does not impose on the state (or upland landowners) an obligation to provide public access over uplands to reach navigable waters, and no Oregon case has held otherwise. Accordingly, the trial court did not err in granting summary judgment for defendants on plaintiffs' first and second claims for relief.

## C. *Article I, Section 20*

Plaintiffs contend that the trial court erred in concluding, as to their third claim for relief, that neither Resolution 12-12 nor the swim-park rule violate Article I, section 20. The court did not err in either respect.

Article I, section 20, the Privileges and Immunities Clause, provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." "[R]equiring privileges or immunities to be granted 'equally' permits the legislature to grant privileges or immunities to one citizen or class of citizens as long as similarly situated people are treated the same." *State v. Savastano,* 354 Or 64, 73, 309 P3d 1083 (2013); *see also Gunn v. Lane County,* 173 Or App 97, 104-05, 20 P3d 247 (2001), *rev den,* 334 Or 631 (2002) (Armstrong, J., concurring) ("The people adopted Article I, section 20, to prohibit the state from choosing to prefer some people or classes of people over others.").

We reject plaintiffs' claim that Resolution 12-12 violates Article I, section 20, for the fundamental reason that it does not grant any person or class of persons any "privileges or immunities." Rather, Resolution 12-12 prohibits *"any person* [from] enter[ing] Oswego Lake from Millennium Plaza Park, Sundeleaf Plaza or the Headlee Walkway." Therefore, it confers no benefit on anyone. *See Crocker and Crocker,* 332 Or 42, 54, 22 P3d 759 (2001) ("The equal privileges and immunities clause scrutinizes benefits in the form of privileges and immunities given to a particular class[.]"). As the trial court correctly concluded, the resolution "applies to all persons and classes of persons and cannot, therefore,

constitute a violation of Article I, section 20, of the Oregon Constitution."

Plaintiffs contend, however, that Resolution 12-12 nonetheless violates Article I, section 20, because it has the *effect* of "creat[ing] a monopoly right for [LOC] members to use the Lake." In other words, in plaintiffs' view, although Resolution 12-12 prohibits *everyone* from *entering* the lake from the city parks, it nonetheless results in one particular class of people—LOC members—having the benefit of being able *to use* the lake for recreation (because they have access to it from other upland property); therefore, Resolution 12-12 violates Article I, section 20. We are not persuaded by that argument. The ordinance adopted by the city governs city property and applies equally to all people in conformity with Article I, section 20; that *LOC* is able to grant or deny access to the lake from upland property *it* controls does not make *the city's ordinance* regulating its property discriminatory class legislation in violation of Article I, section 20.[33]

Turning to the swim-park rule, plaintiffs contend that it violates Article I, section 20, because, by its adoption, "[t]he City has created a specially privileged class consisting of City residents entitled to exclusive access to the Lake at the City's swim park." Stated in Article I, section 20, terms, in plaintiffs' view, the swim-park rule grants a privilege—using the swim park—to some class of people (city residents) that it does not give to others (noncity residents).

As we have explained:

"The appropriate standard for reviewing class discrimination depends on the type of class at issue. A so-called 'class' that consists of members who would not be considered as belonging to a distinctive group except for the very government action that is being challenged is not, in fact, a 'class' for purposes of Article I, section 20, and such 'classifications' do not constitute unlawful discrimination. [*State v.*] *Clark*, 291 Or [231,] 240[, 630 P2d 810, *cert den*, 454 US

---

[33] The cases on which plaintiffs rely for their contrary view—*State v. Savage*, 96 Or 53, 184 P 567 (1919), 189 P 427 (1920), and *Mendiola v. Graham*, 139 Or 592, 10 P2d 911 (1932)—are wholly inapposite. In those cases, unlike here, it was the challenged legislation itself that directly granted a special privilege or monopoly to a class of people, *Savage*, 96 Or at 60, or granted to a class the power to create the monopoly for themselves, *Mendiola*, 139 Or at 612.

1084 (1981)]; *Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435, *cert den*, 498 US 819 (1990). * * * A 'true class,' on the other hand, is one whose members have in common some 'antecedent personal or social characteristics or societal status.' *Hale v. Port of Portland*, 308 Or 508, 525, 783 P2d 506 (1989). A system that distributes privileges or immunities based on membership in a 'true' class is subjected to a demanding level of judicial scrutiny if it is 'based on immutable traits or traits on the basis of which class members are subjected to adverse social or political stereotyping or prejudice.' *Cox v. State of Oregon*, 191 Or App 1, 9, 80 P3d 514 (2003) (Schuman, J., concurring). The classic example is race. *Other true classification systems survive if they are 'rational.'*"

*Advanced Drainage Systems, Inc. v. City of Portland*, 214 Or App 534, 539-40, 166 P3d 580 (2007) (emphasis added).

Here, we do not understand the classification scheme—resident versus nonresident—to be based on a trait or traits that would subject it to heightened scrutiny, nor do plaintiffs explain why that would be the case. Accordingly, we consider whether the rule has a rational basis. *Crocker*, 332 Or at 55 ("When distinctions are based on personal characteristics that are not immutable, this court reviews the classification for whether the legislature had a rational basis for making the distinction." (Citing *Seto v. Tri-County Metro. Transportation Dist.*, 311 Or 456, 466-67, 814 P2d 1060 (1991) (geographic classification reviewed for rational basis); *Hewitt v. SAIF*, 294 Or 33, 45, 653 P2d 970 (1982) (classifications based on immutable traits are suspect).); *cf. Gunn*, 173 Or App at 104-05 (Armstrong, J., concurring) (discussing import of rational-basis test under Article I, section 20). We conclude that it does.

As the city argues, there are at least two rational bases for the swim-park rule: (1) compliance with the deed restrictions to avoid the risk of losing ownership of the swim park and (2) preserving a limited city resource[34] for city residents who pay for it through the city's general fund. Plaintiffs contend that the deed restrictions are ineffective and unenforceable under *Darling* and, therefore, cannot

---

[34] The city points out that the swim park "is a very small facility that provides limited recreational opportunities."

provide a legitimate basis for the rule. As we have already explained, 285 Or App at 208-09, *Darling* does not control here. *Darling* governed the validity of a *dedication* of property as part of an approved plat, not the transfer of land by deed, as is the case here. Moreover, we agree with the city that, because the deed restrictions exist, it was rational for the city to decide to comply with them rather than risk litigation and the possibility of losing ownership of the property. Finally—even without the deed restrictions—the city reasonably could decide to limit the swim park's use to city residents on the ground that city residents are the people who pay for the swim park's operation and maintenance through the city's general fund. *See Gunn,* 173 Or App at 104 ("[T]he challenged law will satisfy Article I, section 20, as long as 'the classification * * * bear[s] some rational relationship to [a] legitimate end.'" (Quoting *Withers v. State of Oregon,* 163 Or App 298, 309, 987 P2d 1247 (1999), *rev den,* 331 Or 284 (2000) (omission and second and third brackets in *Gunn*)).). That rationale itself satisfies the test. Thus, the swim-park rule does not violate Article I, section 20, and the trial court correctly granted summary judgment in favor of the city on plaintiffs' third claim for relief.

## III. CONCLUSION

In sum, the trial court correctly concluded that (1) plaintiffs were not entitled to a partial declaration that "the entire Lake is public"; (2) the public-trust doctrine does not obligate the state (or upland landowners, including the city) to provide public access to navigable waters over uplands that the state does not own; and (3) neither Resolution 12-12 nor the swim-park rule violates Article I, section 20, of the Oregon Constitution. Accordingly, we conclude that the trial court correctly granted summary judgment to defendants on all of plaintiffs' claims for relief. However, dismissal of the case was not the correct disposition of it; rather, the trial court should have entered a judgment declaring the parties' respective rights. *See Doe v. Medford School Dist. 549C,* 232 Or App 38, 46, 221 P3d 787 (2009) ("When the dismissal of a declaratory judgment action was clearly based on a determination of the merits of the claim * * *, our practice has been to review that determination as a matter of law and then remand for the issuance of a judgment that declares

the rights of the parties in accordance with our review of the merits."); *Beldt v. Leise*, 185 Or App 572, 576, 60 P3d 1119 (2003) ("If there is a justiciable controversy, the plaintiff is entitled to a declaration of its rights, even if that declaration is directly contrary to what it believes its rights to be."). Accordingly, we vacate and remand for the trial court to enter a judgment consistent with this opinion that declares the parties' rights.

Vacated and remanded.